**2024-1661**

# United States Court of Appeals for the Federal Circuit

ZIP TOP, INC.,

*Plaintiff-Appellant,*

– v. –

SC JOHNSON & SON INCORPORATED,

*Defendant-Appellee.*

*On Appeal from the United States District Court for the Northern District of Illinois in No. 1:22-cv-05028, Honorable Jorge L. Alonso*

## NON-CONFIDENTIAL BRIEF FOR PLAINTIFF-APPELLANT

R. WILLIAM BEARD, JR.
BRIAN C. BANNER
TRUMAN H. FENTON
SLAYDEN GRUBERT BEARD PLLC
401 Congress Avenue, Suite 1650
Austin, Texas 78701
(512) 402-3550
wbeard@sgbfirm.com
bbanner@sgbfirm.com
tfenton@sgbfirm.com

*Counsel for Plaintiff-Appellant*

JUNE 7, 2024

COUNSEL PRESS (800) 4-APPEAL • (329427)

**For FCR32(a)(3), independent claims 1 and 9 are "at issue":**

1. A silicone container making process, the process comprising:
placing a first mold in proximity with at least a second mold to define a mold cavity of sufficient size and shape to mold a unitary whole container;
mixing a base-forming material and a catalyst to make uncured silicone;
putting the uncured silicone into the mold cavity;
curing the uncured silicone by applying heat and pressure to the uncured silicone in the mold cavity until the silicone cures to form the unitary whole container comprising:
a container portion defining a mouth, wherein the mouth has at least one flexible spout and first and second interior sides opposite each other;
a zipper portion comprising:
a female zipper member extending from the first interior side of the mouth, the female zipper member comprising:
a female middle section comprising two middle flanges defining a middle channel between the two middle flanges, and
at least one female end section proximate the at least one flexible spout and comprising two end flanges extending from the first interior side of the mouth to define an end channel between the two end flanges,
wherein the two middle flanges extend farther from the first interior side of the mouth than the two end flanges;
a male zipper member extending from the second interior side of the mouth, wherein the female and male zipper members are positioned opposite each other so as to be engageable when closing the mouth, the male zipper member comprising:
a male middle section comprising a middle trunk; and
at least one male end section proximate the at least one flexible spout comprising an end trunk,
wherein the middle trunk extends farther from the second interior side of the mouth than the end trunk;
opening the first mold relative to the at least second mold; and
removing the container from the mold cavity.

9. A silicone container making process, the process comprising:
placing a first mold in proximity with at least a second mold to define a mold cavity of sufficient size and shape to mold a unitary whole container;
mixing a base-forming material and a catalyst to make uncured silicone;
putting the uncured silicone into the mold cavity;

curing the uncured silicone, by applying heat and pressure to the uncured silicone in the mold cavity, to form the unitary whole container having a durometer of between 30 and 80 shore A and comprising:
a container portion defining a mouth, wherein the mouth has at least one flexible spout and first and second interior sides opposite each other, wherein the first and second interior sides have thicknesses greater than 0.5 mm;
a zipper portion comprising:
a female zipper member extending from the first interior side of the mouth and tapering until it terminates at the at least one flexible spout; and
a male zipper member extending from the second interior side of the mouth and tapering until it terminates at the at least one flexible spout;
opening the first mold relative to the at least second mold; and
removing the unitary whole container from the mold cavity.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-1661

**Short Case Caption** Zip Top, Inc. v. SC Johnson & Son Incorporated

**Filing Party/Entity** Zip Top, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/19/2024

Signature: /s/R. William Beard, Jr.

Name: R. William Beard, Jr.

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Zip Top, Inc. | LGI - Zip Top, LLC | Let's Gel, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| R. William Beard, Jr. | Brian E. Martin | |
| Truman H. Fenton | Stamos & Trucco LLP | |
| Slayden Grubert Beard PLLC | Brian C. Banner | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .................... i
TABLE OF CONTENTS .................... iv
TABLE OF AUTHORITIES .................... vi
STATEMENT OF RELATED CASES .................... 1
JURISDICTIONAL STATEMENT .................... 1
INTRODUCTION .................... 2
STATEMENT OF ISSUES .................... 2
I. STATEMENT OF THE CASE .................... 2
A. Background .................... 2
B. The ’890 Patent .................... 4
C. Accused Product .................... 10
II. SUMMARY OF THE ARGUMENT .................... 13
III. STANDARD OF REVIEW .................... 15
IV. ARGUMENT .................... 15
A. The District Court Wrongly Construed “Spout” .................... 16
1. The Claims Do Not Support a Negative Limitation—“the zipper members are not the spout or part of it; rather, the spout is a separate feature” .................... 17
2. The District Court Incorrectly Determined the “Spout” Is Entirely Above the Zipper Members .................... 19
3. The District Court Incorrectly Found the Cross over Zipper Members Are “Adjacent to the Spout” and Are Not “Part of the Spout” .................... 28
4. The District Court Incorrectly Found the “Container Portion” and the “Zipper Portion” Are Completely Separate .................... 31
B. The District Court Disregarded Plaintiff’s Evidence of Infringement .................... 35
1. Even Under the District Court’s Incorrect Claim Construction, the Accused Product Infringes, But the District Court Disregarded the Evidence .................... 38

2. Under the Correct Plain and Ordinary Construction, The District Court Disregarded Zip Top's Evidence of a "Spout" Above and Below the Zipper Members ....................................................................39

a) [1C][9D] "a container portion defining a mouth, wherein the mouth has at least one flexible spout and first and second interior sides opposite each other;" ....................................................................40

b) [1F] "at least one female end section proximate the at least one flexible spout and comprising two end flanges extending from the first interior side of the mouth to define an end channel between the two end flanges," ....................................................................40

c) [1J] "at least one male end section proximate the at least one flexible spout comprising an end trunk," ....................................................................41

d) "at least one flexible spout" includes "cross over" spouts of Figures 5B and 5C ....................................................................42

3. Under either construction, the District Court Disregarded Zip Top's Evidence of a "Spout" ....................................................................47

a) SC Johnson did not dispute Zip Top's evidence of a "spout" above and below the zipper members ....................................................................58

b) Zip Top presented uncontroverted evidence of the mixing/molding element where SC Johnson only disputed the sufficiency of that evidence ....................................................................58

V. CONCLUSION ....................................................................61

The material redacted from this brief is subject to a protective order. The confidential information on pages 12-13, 59 relates to manufacturing details, which have been designated as confidential and produced under the District Court's default protective order.

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 37, 61

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*,
73 F.3d 1573 (Fed. Cir. 1996) .......... 36

*Centricut, LLC v. Esab Grp., Inc.*,
390 F.3d 1361 (Fed. Cir. 2004) .......... 48

*CIAS, Inc. v. All. Gaming Corp.*,
504 F.3d 1356 (Fed. Cir. 2007) .......... 31

*Gillette Co. v. Energizer Holdings, Inc.*,
405 F.3d 1367 (Fed. Cir. 2005) .......... 31

*Intercontinental Great Brands LLC v. Kellogg N.A. Co.*,
869 F.3d 1336 (Fed. Cir. 2017) .......... 37

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
327 F.3d 1364 (Fed. Cir. 2003) .......... 31-32

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*,
467 F.3d 1355 (Fed. Cir. 2006) .......... 15

*Pitney Bowes, Inc. v. Hewlett–Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999) .......... 15

*SCA Promotions, Inc. v. Yahoo!, Inc.*,
868 F.3d 378 (5th Cir. 2017) .......... 60

*Science Applications Int'l Corp. v. United States*,
169 Fed. Cl. 643 (2024) .......... 31

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) .......... 16

*Zelinski v. Brunswick Corp.*,
996 F. Supp. 757 (N.D. Ill. 1997) .......... 36

### STATUTES AND REGULATIONS

21 C.F.R. § 175.300 .......... 60

## STATEMENT OF RELATED CASES

While two patents were at issue in the district court, this appeal involves only one of those patents: U.S. Patent No. 11,383,890 ("the '890 patent"). Counsel for Appellant Zip Top, Inc. ("ZT") is unaware of any other appeals from the same civil action or other proceedings in the lower court previously before this or any other appellate court.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 & 1338. It entered its final and appealable judgment on March 11, 2024. Appellant ZT filed its notice of appeal on April 4, 2024. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## INTRODUCTION

This case arises from the district court's determination on cross-motions for summary judgment on infringement that the Ziploc® Endurables™ container ("Accused Product") by Appellee SC Johnson & Sons, Inc. ("SCJ") does not infringe the '890 Patent. In finding non-infringement, the district court construed the term "spout" and determined the Accused Product does not infringe the claimed "spout."

The judgment should be vacated. This Court should render a decision construing the term "spout" and finding the Accused Product infringes the claimed "spout," because there are no factual disputes about how the Accused Product operates. In the alternative, this Court should construe the term "spout" and remand to the District Court for further proceedings consistent with this Court's findings.

## STATEMENT OF ISSUES

1. Did the district court err as a matter of law in narrowly construing "spout" to exclude the preferred embodiments of Figures 5A, 5B, and 5C.

2. Did the district court err as a matter of law in failing to consider all evidence of structures corresponding to the "spout" identified by Zip Top.

## I. STATEMENT OF THE CASE

### A. Background

ZT created what is now a booming market for silicone containers. Appx4203, ¶6. In 2017, ZT's founder, Rebecca Finell, invented a new silicone container and

applied for patents. Appx4204, ¶7. In 2018, she introduced the Zip Top® silicone container to the world at the International Home and Housewares Show in Chicago, Illinois. Appx4204, ¶8. Zip Top® containers were widely praised and recognized in the industry. Appx4204, ¶9. From 2018–2021, ZT successfully marketed its Zip Top® silicone containers through national retailers, ecommerce, direct-to-consumer marketing, and its website (www.ziptop.com). Appx4205, ¶10.

In 2018, a company named, Stasher, Inc. (www.stasherbag.com) sued ZT alleging infringement of a Stasher patent related to a silicone "bag," not a stand up "container." *Stasher, Inc. v. Zip Top LLC, et al.*, 18-CV-312 (W.D. Tex. 2018). ZT petitioned for *inter partes* review of Stasher's patent by the Patent and Trademark Office. *Zip Top, LLC v. Stasher, Inc.*, IPR2018-01216. After the district court narrowly construed Stasher's patent claims, both cases settled, and ZT continued to successfully market its Zip Top® silicone containers without restriction. Appx4205, ¶11.

In December 2019, SCJ acquired Stasher and began selling Stasher silicone bags in addition to its Ziploc plastic bags. Appx4206, ¶12. In June 2022, SCJ introduced its Accused Product in direct competition with ZT. Appx4206, ¶ 13; *see also* "Endurables: Silicone Bags, Pouches & Containers | Ziploc," *available at* www.ziploc.com/en/products/Endurables (last accessed Jun. 6, 2024). In 2021, SCJ began leveraging its significant plastic bag market power (Ziploc) to further

penetrate the silicone bag/container market to replace ZT's shelf space at national retailers and take sales away from ZT. Appx4206, ¶13.

Also in July 2022, the United States Patent and Trademark Office awarded ZT the patent-in-suit (U.S. Patent No. 11,383,890) for the Zip Top® silicone container. Because SCJ's Accused Product infringes this patent, ZT filed this lawsuit in September 2022. Appx4206, ¶14; *see also* Appx25.

Having lost most all shelf space at national retailers to SCJ, ZT since filed for bankruptcy. *In re Zip Top, Inc.*, Case No. 23-10832-SMR (Bankr. W.D. Tex.). In April 2024, ZT sold its entire business, including the '890 Patent, to LGI-ZIP TOP LLC, which is a wholly owned subsidiary of Let's Gel, Inc. Now, LGI-ZIP TOP LLC sells a fraction of the Zip Top® container sales volume, primarily through on-line marketing channels.

### B. The '890 Patent

On July 12, 2022, United States Patent No. 11,383,890 ("the '890 Patent") was duly and legally issued by the United States Patent and Trademark Office. Appx25. The '890 Patent is titled "Silicone Molding Process for Making a Container with Zipper Members Tapered at a Flexible Spout." Appx25. All claims of the '890 Patent recite, "a silicone container making process." Appx52-Appx53.

The ’890 Patent specification shows containers of various shapes and sizes: a short container (Figs 1A-1J); tumblers (Figs. 2A-2J, 5A-5C, 6A-6G, 7A-7D); a bowl (Figs. 3A-3B); and a tall container (Figs. 4A-4B). Appx29-Appx46.

Figures 6A-6G show a container portion comprises a **mouth 62** that has **at least one flexible spout 63** and **first and second interior sides** opposite each other, and a zipper portion comprising a **female zipper member 68** and a **male zipper member 67**. Appx50-Appx51, 8:63-10:14.




FIG. 6B

Appx42-Appx44 (annotated). Figures 6A, 6B, 6F, and 6G show **dotted lines** in each of the different views to demarcate the **spouts 63**, where the container transitions from convex sides to concave spouts (viewed from exterior). Given the "mouth has **at least one flexible spout** and **first and second interior sides** opposite each other" (Appx52, 11:29-32, 12:47-48), the **mouth 62** extends from the lip at the opening

down into the container far enough to include the **first and second interior sides** and the **at least one flexible spout 63**.

Figures 7A-7D show a container portion comprises a **mouth 72** that has **at least one flexible spout 73** and **first and second interior sides** opposite each other, and a zipper portion comprising a **female zipper member 78** and a **male zipper member 77**. Appx51-Appx52, 10:15-11:9.




FIG. 7B

Appx45-Appx46 (annotated). Figure 7A uses reference character **73** to indicate that the "**spout**" is both above and below the female and male zipper members 78 and 77. Figures 7A and 7B show **dotted lines** in to demarcate the **spouts 73**, where the container transitions from convex sides to concave spouts (viewed from exterior). Given the "**mouth** has **at least one flexible spout** and **first and second interior sides** opposite each other" (Appx52, 11:29-32, 12:47-48), the **mouth 72** extends

from the lip at the opening down into the container far enough to include the **first and second interior sides** and the **at least one flexible spout 73**.

Figures 5A & 5B show spouts that include "cross over" zipper members. "FIG. 5B is a cross-sectional top view of the tumber shown in FIG. 5A" (Appx50, 8:21-22), wherein a container portion comprises a **mouth 52** that has **at least one flexible spout 53** and **first and second interior sides** opposite each other, and a zipper portion comprising a **female zipper member 58** and a **male zipper member 57**.



FIG. 5B

Appx39-Appx40 (annotated). "When open, the **mouth 52** forms a **spout 53** at each tip 59." Appx50, 8:42-43. Figure 5B indicates the **spouts 53** are at the interior surfaces of the male and female zipper members 57 and 58, where they "'cross over' each other at the tips 59." Appx50, 8:35-36. Thus, the **"at least one flexible spout" 53** includes portions of the sides above and below the zipper members extending

from the lip down into the mouth, as shown in Figure 5A, and also includes the zipper member interior surfaces where "the zipper members 57 and 58 'cross over' each other at the tips 59," as shown in Figure 5B.

Figures 5A & 5C show an alternative container with spouts that include "cross over" zipper members. "FIG. 5B is a cross-sectional top view of an alternative tumbler 50 shown in FIG. 5A" (Appx50, 8:44-45), wherein a container portion comprises a **mouth 52** that has **at least one flexible spout 53** and **first and second interior sides** opposite each other, and a zipper portion comprising a **female zipper member 58** and a **male zipper member 57**.







FIG. 5C

Appx39 (annotated), Appx41 (annotated). "The male and female zipper members 57 and 58 extend all the way to the most extreme ends of the tips 59 and 'cross over' each other at the tips 59." Appx50, 8:56-59. Figure 5C indicates the **spouts 53** are at the innermost surfaces of the zipper members 57 and 58, where they "'cross over'

each other at the tips 59." Appx50, 8:56-59. Thus, the **"at least one flexible spout" 53** includes portions of the sides above and below the zipper members extending from the lip down into the mouth, as shown in Figure 5A, and also includes the zipper member innermost surfaces where they "'cross over' each other at the tips 59," as shown in Figure 5C.

### C. Accused Product

SCJ makes, uses, causes to be used, offers for sale, sells, and/or imports Ziploc ENDURABLES containers (Accused Product).






Appx4087; *see also* Appx528; Appx5203; Appx5204. SCJ has or is now distributing Accused Product through retail stores including, but not limited to, Walmart, Target, Amazon, Kroger, HEB, and Meijer. Appx232-Appx233.

The Accused Product has a **base** a **plurality of sides** extending from the **base** to form the container. Appx535 (proving up Physical Exhibits 15 and 16); Appx5203; Appx5204.





Appx4039; Appx5203 (annotated); Appx5204 (annotated). The Accused Product has a **mouth** defined by the sides opposite the base, the **mouth** extending from one tip to another tip. The **mouth** forms a **spout** at each corner of the **mouth**. The Accused Product has a **seal** of the **mouth** formed by a **male zipper member** and a **female zipper member**.




Appx4040; Appx5203 (annotated); Appx5204 (annotated). The Accused Product has a **mouth** that forms two **flexible spouts** and two **interior sides** opposite each other.



Appx4033-Appx4034; Appx5203 (annotated); Appx5204 (annotated). The Accused Product has a **male zipper member** and a **female zipper member** that "cross over" at the ends where they are "glued" together with silicone material in a permanently engaged configuration, even when the mouth is open.




Appx482 (SCJ demonstrative, colored annotations added); *see also* Appx4024; Appx5203; Appx5204.

SCJ makes the Accused Product from base material as a [redacted] identified as [redacted]. Appx4775-Appx4776; Appx4247 n.10

(identifying the molding specification and the specification for the base material); Appx4308 (DSAF 1, 2, and 4). The base material is “mfg. details [redacted] silicone . . . supplied as mfg. details [redacted]”. Appx4778. SCJ’s product packaging confirms the Accused Product is molded from platinum silicone, which reads “PLATINUM SILICONE Reusable, food grade silicone.” Appx4287; Appx5203; Appx5204.

## II. SUMMARY OF THE ARGUMENT

The District Court erred as a matter of law in narrowly construing “spout” to exclude the preferred embodiments of Figures 5B and 5C. While the District Court correctly accepted the parties’ agreed plain and ordinary meaning—“distinct feature that directs liquid from and facilitates the pouring of fluid from a container”—it incorrectly added negative limitations that “the zipper members are not the spout or part of it; rather, the spout is a separate feature.” To support the negative limitations, the District Court misinterpreted the ’890 Patent as teaching that the “spout” is only above the zipper members at the lip of the mouth. Further, the District Court’s construction cannot be correct because it excludes the preferred embodiments of Figures 5B and 5C. All embodiments illustrated in the patent show the zipper members overlap with the spouts. Thus, the negative limitations added by the District Court to the parties’ agreed plain and ordinary construction of “spout” must be rejected. This Court should properly construe “spout” plainly and ordinarily as a

"distinct feature that directs liquid from and facilitates the pouring of fluid from a container."

The District Court erred as a matter of law in failing to consider all evidence of structures of the Accused Product corresponding to the "spout" identified by ZT. Even under the District Court's incorrect construction, the Accused Product infringes because it has a V-shaped, "above zipper member" portion at the corner of the mouth that is clearly a "distinct feature that directs liquid from and facilitates the pouring of fluid from a container" and "the zipper members are not part of [this V-shaped, above zipper member portion]; rather, [this V-shaped, above zipper member portion] is a separate feature." Further, under the correct claim construction, significant evidence shows that throughout this case ZT has consistently identified the corners of the mouth above and below the zipper members as well as the innermost surfaces of the zipper members where they "cross over" as the structures corresponding to the claimed "spout." Figures 5A, 5B, and 5C of the '890 Patent show mouth corners above and below the zipper members as well as the innermost surfaces of the zipper members where they "cross over" correspond to the claimed "spout." The Accused Product is nearly identical to the preferred embodiments shown in Figures 5A, 5B, and 5C. The facts concerning these structures are not disputed. Thus, this Court should render a decision of infringement.

## III. STANDARD OF REVIEW

This Court reviews "a district court's grant of summary judgment of non-infringement without deference." *O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1369 (Fed. Cir. 2006). *De novo* review of summary judgment of noninfringement requires two steps—claim construction, which is reviewed without deference, and infringement, which is reviewed to determine whether there was no genuine issue of material fact. *See Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999).

## IV. ARGUMENT

The District Court improperly excluded the embodiments illustrated in Figures 5A, 5B, and 5C, by adding negative limitations to the construction of "spout." And the District Court improperly failed to consider all the evidence ZT offered identifying corresponding Accused Product "spout" structures nearly identical to the embodiments illustrated in Figures 5A, 5B, and 5C. Each is reversible error.

The district court erred as a matter of law in narrowly construing "spout" by adding negative limitations that exclude the preferred embodiments of Figures 5B and 5C. Further, the district court erred as a matter of law in failing to consider all the evidence of structures corresponding to the "at least one flexible spout."

### A. The District Court Wrongly Construed "Spout"

The district court erred as a matter of law in narrowly construing "spout" to mean:

> the zipper members are not the spout or part of it; rather, the spout is a separate feature. Thus, the Court construes the term "spout" to mean a "distinct feature that directs liquid from and facilitates the pouring of fluid from a container." The Court does not construe the term "spout" to include the zipper members, which are a separate element of the invention.

Appx12. The Court correctly construed the term "spout" to have the plain and ordinary meaning—a "distinct feature that directs liquid from and facilitates the pouring of fluid from a container," but incorrectly added negative limitations that "the zipper members are not the spout or part of it; rather, the spout is a separate feature." Appx11.

The District Court's addition of negative limitations is fatally flawed because it excludes two preferred embodiments shown in Figures 5A & 5B and Figures 5A & 5C. A claim construction that excludes a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). The evidence does not support the District Court's negative limitation. In particular, the claims do not recite and the specification does not suggest "spout" should be construed to include a negative limitation—"the zipper members are not the spout or part of it; rather, the spout is a separate feature." The District Court applied this to mean that the spout

cannot include any portion of the zipper members, and that is not correct. ZT is not arguing that the spout and the zipper members are the same structure, but rather that the specification specifically contemplates embodiments where portions of the zipper members are present in the spout. The claims broadly cover and the specification discloses embodiments where:

(1) the mouth forms a spout by the interior sides above and below the zipper members—Figures 6A-6G and 7A-7D (Appx42-Appx46); and




(2) the mouth forms a spout by the interior sides above and below the zipper members and the zipper members where they "crossover" each other—Figures 5A & 5B and Figures 5A & 5C (Appx39-Appx41).




### 1. ***The Claims Do Not Support a Negative Limitation—"the zipper members are not the spout or part of it; rather, the spout is a separate feature"***

The claimed processes make unitary whole containers. All claims of the '890 Patent recite a "silicone container making process." Appx52, 11:17 (Claim 1), 12:34

(Claim 9). All claims recite, "placing a first mold in proximity with at least a second mold to define a mold cavity of sufficient size and shape to mold a unitary whole container." Appx52, 11:19-21, 12:36-38. All claims further recite process steps of "putting the uncured silicone into the mold cavity," and "curing the liquid uncured silicone, by applying heat and pressure to the liquid uncured silicone in the mold cavity, to form the unitary whole container." Appx52, 11:24-27, 12:41-44. Thus, the container made by this process has no separate features but is a unitary whole.

In addition to the process steps, Claim 1 further recites the process is to make a "unitary whole container comprising:" (1) "a container portion defining a mouth, wherein the mouth has at least one flexible spout and first and second interior sides opposite each other" ; and (2) "a zipper portion comprising: a female zipper member extending from the first interior side of the mouth, the female zipper member comprising . . . at least one female end section proximate the at least one flexible spout . . . [and] a male zipper member extending from the second interior side of the mouth, . . . the male zipper member comprising . . . at least one male end section proximate the at least one flexible spout." Appx52, 11:27-55. Claim 1 includes no negative limitations, in particular, it does not recite that the zipper members are not the spout or part of it. Further, Claim 1 does not recite that any of the features are "separate," much less that the spout is a separate feature from the zipper members. To the contrary, Claim 1 recites a process for making a "unitary whole container."

In addition to the process steps, Claim 9 further recites the process is to make a "unitary whole container . . . comprising:" (1) "a container portion defining a mouth, wherein the mouth has at least one flexible spout and first and second interior sides opposite each other"; and (2) "a zipper portion comprising: a female zipper member extending from the first interior side of the mouth and tapering until it terminates at the at least one flexible spout; and a male zipper member extending from the second interior side of the mouth and tapering until it terminates at the at least one flexible spout." Appx52, 12:38-57. Claim 9 includes no negative limitations, in particular, it does not recite that the zipper members are not the spout or part of it. Further, Claim 9 does not recite that any of the features are "separate," much less that the spout is a separate feature from the zipper members. To the contrary, Claim 9 recites a process for making a "unitary whole container."

Thus, the claims do not support the District Court's negative limitation—"the zipper members are not the spout or part of it; rather, the spout is a separate feature."

### 2. *The District Court Incorrectly Determined the "Spout" Is Entirely Above the Zipper Members*

The negative limitations of the District Court's claim construction are based on the District Court's incorrect determination that "[e]ach embodiment depicted in the patent, including the embodiment depicted in Figures 5A, 5B, and 5C, includes a distinct, **approximately V-shaped or 'liplike' (Pl.'s LR 56.1 Resp. ¶ 20) feature at each tip**, separate from the zipper members, that resembles what anyone would

call the spout of a pitcher or like container, and it is shaped as if to facilitate pouring in the same manner," and "it is clear that the **'spout' at 53 is separate from and above the 'zipper members.'"** Appx10 (emphasis added); Appx4056-Appx4057. The District Court's misinterpretation of the spout being above the zipper members may be illustrated for each embodiment as follows:







FIG. 6B






FIG. 6F

Appx42-Appx44, Figures 6A, 6B, 6F, and 6G (annotated to show District Court's interpretation of the spout being above the zipper members).




FIG. 7B

Appx45-Appx46, Figures 7A and 7B (annotated to show District Court's interpretation of the spout being above the zipper members).




FIG. 5B

FIG. 5C

Appx39-Appx41, Figures 5A, 5B, and 5C (annotated to show District Court's interpretation of the spout being above the zipper members).

Clearly, this is the District Court's interpretation of "each embodiment depicted in the patent," because with reference to Figures 5A, 5B, and 5C, the District Court explained "[f]or these drawings, the specification defines reference numeral **52 as the 'mouth,'** numeral **53 as the 'spout'** at the tips [59] when the 'mouth' is open, and numerals 57 and 58 as the 'zipper members.' (*Id*. at col. 7 l. 48,

col. 8 ll. 22-23, 43.) When Figures 5B and 5C are compared with Figure 5A, **it is clear that the 'spout' at 53 is separate from and above the 'zipper members' at 57 and 58**, although it may appear otherwise from a cross-sectional top view." Appx11 (emphasis and colors added). The District Court argued Figures 6A and 7A support its interpretation of Figure 5A wherein, "[i]n Figures 6A and 7A, the zipper members are more pronounced, and they are labeled with reference numerals, so it is clearer than in Figure 5A where in the container they are located; and they do not appear to form part of the spout. . . . The zipper members could hardly "interfere" (or not) with the spout if they are part of the spout." Appx11.

In view of this incorrect "spout is separate from and above the zipper members" interpretation of "each embodiment depicted in the patent," the District Court improperly added negative limitations to its construction of "spout"—"the zipper members are not the spout or part of it; rather, the spout is a separate feature." Appx12.

The District Court incorrectly interpreted "each embodiment depicted in the patent," because the "spouts" are expressly depicted and identified as extending both above **and below** the zipper members. Figure 7A uses **reference character 73** to indicate that the "**spout**" is both above and below the female and male zipper members 78 and 77. Figure 7B uses **reference character 73** to point directly between the ends of the zipper members, not above them.







FIG. 7B

Appx46-Appx47 (annotated). Further, Figures 7A and 7B show **dotted lines** to demarcate the **spouts 73**, which clearly extend below the zipper members. Figures 7A and 7B also show **V-shaped features** at the lip of the mouth with the apexes of the V-shapes at the tips 79 and the apexes of the V-shapes extend to well below the zipper members. The District Court misinterpreted the embodiment of Figures 7A and 7B because the **"spouts"** are expressly depicted and identified as extending both above **and below** the zipper members.

Similarly, the **"spout" reference character 63** in Figure 6A points both to the lip of the opening and to a point directly between the ends of the zipper members. Figure 6B uses **reference character 63** to point directly between the ends of the

zipper members, not above them. Figure 6G points the **“spout” reference character 63** to the center of the ends of the female zipper member 68, not above it.







FIG. 6B






FIG. 6F

Appx42-Appx44 (annotated). Figures 6A, 6B, 6F and 6G show **dotted lines** in each of the different views to demarcate the **spouts 63**, which clearly extend below the zipper members. Figures 6A and 6B also show **V-shaped features** at the lip of the mouth with the apexes of the V-shapes at the tips 69 and the apexes of the V-shapes extend to well below the zipper members. The District Court misinterpreted the

embodiment of Figures 6A, 6B, 6F and 6G because the **"spouts"** are expressly depicted and identified as extending both above **and below** the zipper members.

Figures 5A and 5B show "[w]hen open, the **mouth 52** forms a **spout 53** at each tip 59." Appx50, 8:42-43. Appx50, 8:35-36. Figures 5A and 5B also show **V-shaped features** at the lip of the mouth with apexes of the V-shapes at the tips 59 and the apexes of the V-shapes extend from the lip of the mouth to below the zipper members. The **V-shaped features** of the **spout 53** are also shown at the innermost surfaces of the zipper members where the zipper members "cross over."



FIG. 5B

Appx39-Appx40 (annotated). While the District Court called ZT's "lengthy discussion of the cross over zipper members a 'boondoggle' and a 'sideshow,'" the District Court expressed uncertainty in its own analysis of Figures 5A, 5B, and 5C. *See* Appx9 ("although it may appear otherwise from a cross-sectional top view").

The District Court misinterpreted the embodiments of Figures 5A and 5B because the **"spouts"** are expressly depicted and identified as extending both above **and below** the zipper members.

Figures 5A & 5C show an alternative container with spouts that include "cross over" zipper members. Appx50, 8:44-45. Figures 5A and 5B also show **V-shaped features** at the lip of the mouth with apexes of the V-shapes at the tips 59 and the apexes of the V-shapes extend below the zipper members. The **V-shaped features** of the **spout 53** are also shown at the innermost surfaces of the zipper members where the zipper members "cross over."







FIG. 5C

Appx39 (annotated), Appx41 (annotated). The District Court misinterpreted the embodiments of Figures 5A and 5C because the **"spouts"** are expressly depicted and identified as extending both above **and below** the zipper members.

The District Court is wrong in saying that "it is clear that the 'spout' at 53 is separate from and **above the 'zipper members.'**" Appx11 (emphasis added). Thus, the District Court improperly added negative limitations to its construction of "spout"—"the zipper members are not the spout or part of it; rather, the spout is a separate feature." Appx12.

### 3. *The District Court Incorrectly Found the Cross over Zipper Members Are "Adjacent to the Spout" and Are Not "Part of the Spout"*

The District Court determined, "the fundamental flaw in plaintiff's argument is that, without any explanation or justification, plaintiff treats the **cross over zipper members** mentioned in relation to the embodiment depicted in Figures 5A-5C of the '890 patent as *part of the spout*, rather than as separate elements of the patented invention, which happen to be *adjacent to the spout* in that embodiment. Or, as defendant aptly puts it, 'the zipper members do not *form* the spout—they are used *in conjunction with a spout*.'" Appx9 (emphasis in original).

However, Claim 1 merely requires that "end sections" of the zipper members, not the entire zipper members, are "proximate" the at least one spout. In the embodiment depicted in Figures 5A & 5C, the spout 53 includes the tops of the zipper members where they "cross over" and the interior sides above and below the zipper members. The "end sections" of the zipper members are the very tips of the

zipper members, which are "proximate" both the tops of the zipper members where they "cross over" and the interior sides above and below the zipper members.




Appx39 (cropped, annotated); Appx41 (cropped, annotated).

The District Court incorrectly analyzed what claimed structure is required to be "proximate the at least one flexible spout." "In Claim 1, each of the zipper members has an 'end section proximate the at least one flexible spout.' Neither party mentions the tortured syntax of this phrase, but, whatever it means for the 'end section[s]' of the 'zipper member[s]' to be 'proximate the at least one flexible spout,' that bizarre phrase makes clear that the zipper members are one thing and the spout is a separate, 'proximate' thing. (*Id.* at col. 11, ll. 34-55.)" Appx9-Appx10. While the District Court recognized that Claim 1 recites the "end section[s]" are "proximate" the "spout," it incorrectly relied on the proximity of the end sections to the spout to require that they cannot overlap all. However, as illustrated by embodiments in the specification, the end sections of the zipper members overlap and are therefore proximate the spout.

Similarly, the District Court incorrectly analyzed what claimed structures are required to "terminate at the at least one flexible spout," according to Claim 9. The District Court concluded, "in Claim 9, each of the zipper members 'terminates at the at least one flexible spout.' If they 'terminate' at the spout, they are not part of the spout. (*Id.* at col. 12 ll. 52-57.)" Appx10. In the embodiment depicted in Figures 5A & 5C, the spout 53 includes the tops of the zipper members where they "cross over" and the interior sides above and below the zipper members. The tips of the zipper members taper until they terminate at one or both parts of the "at least one flexible spout"—the tops of the zipper members where they "cross over" and/or the interior sides above and below the zipper members.




Appx39 (cropped, annotated); Appx41 (cropped, annotated). Claim 9 does not require the zipper members to terminate at the entire "flexible spout." It is sufficient to satisfy Claim 9 for the zipper members to terminate at any part of "the at least one flexible spout." Thus, the District Court incorrectly analyzed the "terminate at" requirement of Claim 9, which led to the District Court's incorrect conclusion that

the cross over zipper members of the embodiment depicted in Figures 5A-5C are "adjacent to the spout" and are not "part of the spout."

#### 4. *The District Court Incorrectly Found the "Container Portion" and the "Zipper Portion" Are Completely Separate*

The District Court found, "[i]t is clear from the plain language of the two independent claims at issue, Claim 1 and Claim 9, that the zipper members are not part of the spout. Both claims refer to a 'unitary whole container' product comprising (1) a 'container portion defining a mouth' that 'has at least one flexible spout' and (2) a 'zipper portion comprising' a 'female zipper member' and a 'male zipper member.' Appx52, 11:27-55, 12: 44-57. The zipper members are not in the same 'portion' of the claimed 'unitary whole container' as the spout, so they are not part of the spout." Appx9.

However, Claims 1 and 9 use the open-ended "comprising" transitional phrase relative to "the unitary whole container" and the "zipper portion." It is a well-known principle of patent law that comprising claims are construed as "open-ended," meaning "[t]he addition of elements not recited in the claim cannot defeat infringement." *Science Applications Int'l Corp. v. United States,* 169 Fed. Cl. 643, 709 (2024) (citing *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1372–73 (Fed. Cir. 2005); *CIAS, Inc. v. All. Gaming Corp.*, 504 F.3d 1356, 1361 (Fed. Cir. 2007) (noting that comprising claims do not "exclude the possible presence of additional elements or steps"); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d

1364, 1368 (Fed. Cir. 2003) ("The transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps.")). Thus, where the zipper portion is a "comprising" claim element, it does not "exclude the possible presence of addition elements"—part of the "at least one spout."

Further, in every embodiment shown in the '890 Patent, the end sections of the zipper members overlap with the spouts. Figures 7A and 7B show the end sections of the zipper members overlap the spouts and take the same V-shape as the spouts.






FIG. 7B

Appx46-Appx47 (annotated). Figures 6A-6G show the end sections of the zipper members overlap the spouts and take the same V-shape as the spouts.







FIG. 6B



FIG. 6F

Appx42-Appx44 (annotated). Figures 5A and 5B show the end sections of the zipper members overlap the spouts and take the same V-shape as the spouts. In particular, the innermost surfaces of the zipper members take the **V-shape** of the **spout 53** where the zipper members "cross over."







FIG. 5B

Appx39-Appx40 (annotated). Similarly, Figures 5A and 5C show the end sections of the zipper members overlap the spouts and take the same V-shape as the spouts. In particular, the innermost surfaces of the zipper members take the **V-shape** of the **spout 53** where the zipper members "cross over."







FIG. 5C

Appx39 (annotated), Appx41 (annotated). Thus, the specification discloses embodiments where:

(1) the mouth forms a spout by the interior sides above and below the zipper members—Figures 6A-6G and 7A-7D (Appx42-Appx46); and




(2) the mouth forms a spout by the interior sides above and below the zipper members and the zipper members where they "crossover" each other—Figures 5A & 5B and Figures 5A & 5C (Appx39-Appx41).




### B. The District Court Disregarded Plaintiff's Evidence of Infringement

The district court erred as a matter of law in failing to consider all evidence of structures corresponding to the "spout" identified by Zip Top. As explained above, the District Court improperly read additional and improper limitations into the construction of "spout." However, the District Court properly recognized "[t]his dispute concerns the interpretation of the claim, not any material facts regarding the

accused product, so 'the question of literal infringement collapses into claim construction and is amenable to summary judgment.'" Appx13 (quoting *Zelinski v. Brunswick Corp.*, 996 F. Supp. 757, 759 (N.D. Ill. 1997) (citing *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996)). Without any further analysis or explanation of its determinations, the District Court concluded, "[a]fter properly construing the term 'spout'; there is no genuine dispute of material fact that the accused product does not contain a 'spout'; no reasonable juror could find otherwise." Appx13.

The District Court granted summary judgment of non-infringement without consideration or analysis of Zip Top's record evidence. As explained previously, SCJ moved for summary judgment of no infringement addressing only the "spout" limitation of the '890 Patent claims. Appx487-Appx492. ZT responded to SCJ's non-infringement arguments (Appx4018-Appx4028) and cross-moved for summary judgment of infringement of the claims 1, 4, 5, 8, 9, and 12 (Appx4033-Appx4045).

ZT included a detailed explanation of how documentary, testimonial, and physical evidence established infringement of those asserted claims. Appx4033-Appx4045. In particular, ZT presented evidence that the point where the male and female zipper members of the accused products "cross over" functions as a spout in a nearly identical arrangement as one disclosed embodiment of the '890 Patent. Appx4020-Appx4028; *see also* Appx5203; Appx5204. And ZT presented evidence

that the accused products included a spout in regions above and below the "cross over" of the male and female zipper members. Appx4033-4036; Appx4038; *see also* Appx5203; Appx5204. The District Court failed to consider or analyze Zip Top's evidence of a spout above and below the zipper members before granting summary judgment of non-infringement. This was legal error. *See Intercontinental Great Brands LLC v. Kellogg N.A. Co.*, 869 F.3d 1336, 1355 (Fed. Cir. 2017) ("It is jurisprudentially inappropriate to disregard any relevant evidence on any issue in any case, patent cases included."). Nor did SCJ dispute Zip Top's evidence of a spout above and below the zipper members. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (non-movant "must present affirmative evidence in order to defeat a properly supported motion for summary judgment"). Had the District Court considered the entire record it would have reached only one conclusion: the accused products include the claimed spout.

Further, when faced with Zip Top's cross motion for summary judgment of infringement, SCJ only disputed one other claim element: the mixing/molding limitation. The summary judgment record clearly and unequivocally shows this mixing/molding element is satisfied as well. Thus, this Court should reverse and render judgement of infringement. At a minimum, this Court should issue a limited remand on no more than these two disputed elements.

### 1. *Even Under the District Court's Incorrect Claim Construction, the Accused Product Infringes, But the District Court Disregarded the Evidence*

The district court erred as a matter of law in narrowly construing "spout" to mean:

> the zipper members are not the spout or part of it; rather, the spout is a separate feature. Thus, the Court construes the term "spout" to mean a "distinct feature that directs liquid from and facilitates the pouring of fluid from a container." The Court does not construe the term "spout" to include the zipper members, which are a separate element of the invention.

Appx12. But even under this improper construction, the Accused Product infringes the "spout" claim element. The Accused Product has a portion of the mouth that extends from the lip of the mouth down to the zipper members.





The portion of the mouth above the zipper members and at the corners of the mouth infringe the "spout" claim elements, under the District Court's improper claim construction. This V-shaped, "above zipper member" portion of the mouth is clearly

a "distinct feature that directs liquid from and facilitates the pouring of fluid from a container."




Appx4203, ¶5; Appx4214; *see also* Appx5203; Appx5204. In the words of the District Court, this V-shaped, "above zipper member" portion of the mouth "resembles what anyone would call the spout of a pitcher or like container, and it is shaped as if to facilitate pouring in the same manner." Appx10. Thus, the Accused Product infringes the "spout" claim element, even under the District Court's improper claim construction.

**2. *Under the Correct Plain and Ordinary Construction, The District Court Disregarded Zip Top's Evidence of a "Spout" Above and Below the Zipper Members***

In its opening summary judgment brief, ZT cited "spout" evidence as follows.

**a) [1C][9D] "a container portion defining a mouth, wherein the mouth has at least one flexible spout and first and second interior sides opposite each other;"**

Claim elements [1C] and [9D] are infringed by the Accused Product, which has a container portion defining a **mouth**, wherein the **mouth** has **at least one flexible spout** and first and second **interior sides** opposite each other.



Appx4034; *see also* Appx5203; Appx5204.

**b) [1F] "at least one female end section proximate the at least one flexible spout and comprising two end flanges extending from the first interior side of the mouth to define an end channel between the two end flanges,"**

Claim element [1F] is infringed by the Accused Product, which has at least one **female end section** proximate the **at least one flexible spout** and comprising two end flanges extending from the first interior side of the mouth to define an end channel between the two end flanges.






Appx4035; *see also* Appx5203; Appx5204.

**c) [1J] "at least one male end section proximate the at least one flexible spout comprising an end trunk,"**

Claim element [1I] is infringed by the Accused Product, which has at least one **male end section** proximate the **at least one flexible spout** comprising an end trunk. When the container comes out of the mold, the structure corresponding to the claimed "end trunk" is the tapered end of the male zipper member. The container is not materially changed by a subsequent process because: (1) the tapered end of the male zipper member continues to be an "end trunk;" and (2) the tapered end of the gelled silicone added to the container after it comes out of the mold extends the male zipper member and is also an "end trunk."





Appx4036; *see also* Appx5203; Appx5204.

### d) "at least one flexible spout" includes "cross over" spouts of Figures 5B and 5C

The Accused Product has "cross over" spouts just like the "cross over" spout embodiments illustrated in Figures 5B and 5C of the '890 Patent. In both of the "cross over" spout embodiments, described with reference to Figures 5B and 5C of the '890 Patent, the male and female zipper members "cross over" each other at the tips so that the male and female zipper elements completely engage at the tips, even when the mouth of the container is open. Appx50, 8:35-38. Identically, the Accused Product's male and female zipper members "cross over" each other at the tips so that the male and female zipper elements completely engage at the tips, even when the mouth of the container is open. Appx4087-Appx4088 (PSOF8).

Figure 5A illustrates an open tumbler without showing male or female zipper members, and Figures 5B and 5C show cross-sectional top views of the open tumbler, "wherein male and female zipper members 57 and 58 are shown." Appx50, 8:23-23, 8:45-46.




FIG. 5A




FIG. 5B




FIG. 5C

Figures 5B and 5C of the '890 Patent illustrate two separate and different "cross over" spout embodiments. *Compare* Appx50, 8:21-23 *with* Appx50, 8:44-46.

Regarding the Figure 5B "cross over" spout embodiment, it forms a **spout 53** where **male zipper member 57** and the **female zipper member 58** engage, even when the mouth 52 is open. Appx50, 8:35-38; Appx40. "FIG. 5B shows a top view of the tumbler of FIG. 5A, wherein the zipper members cross over and remain engaged at the spouts." Appx48, 3:56-58; Appx40.




FIG. 5B




FIG. 5B

Appx40 (annotated).

> FIG. 5B is a cross-sectional top view of the tumbler shown in FIG. 5A, wherein **male** and **female** zipper members **57** and **58** are shown. The **male zipper member 57** is positioned just inside the mouth 52 and extends from one interior side of the tumbler 50. The **female zipper member 58** is positioned just inside the mouth 52 and extends from the other side of the tumbler 50. In this embodiment, the tumbler 50 has relatively thick tips 59 at opposite ends of the mouth 52, wherein each tip 59 form an interior wall transverse to the axis of the mouth 52. The exterior surfaces of tips 59 provide "handles" for a user to hold the tumbler 50 while closing the zipper members **57** and **58** together. The zipper members terminate at the interior walls of the tips 59 to completely seal the mouth 52 of the tumbler 50 when closed. ***The zipper members 57 and 58 "cross over" each other at the tips 59 so that the male and female zipper elements completely engage at the tips 59, even when the mouth 52 of the tumbler 50 is open as shown in FIG. 5B.*** To close the mouth 52, a user simply squeezes the sides of the mouth 52 together and pinches the zipper members **57** and **58** together until the **male** and **female** zipper members **57** and **58** are completely engaged from tip 59 to tip 59. ***When open, the mouth 52 forms a spout 53 at each tip 59.***

Appx50, 8:21-43 (emphasis added). Figure 5B identifies a **spout 53** where the **male zipper member 57** and the **female zipper member 58** "cross over." Appx40 (annotated).



FIG. 5B

SCJ's Accused Product has the same "cross over" spouts as Figure 5B of the '890 Patent. *See* Appx4087-Appx4088 (PSOF8). The Accused Product forms a **"cross over" spout** where the **male zipper member** and the **female zipper member** engage, even when the mouth is open. Appx5203; PhyEx 16. Thus, the "cross over" spouts of the Accused Product infringe the "at least one flexible spout" of the Asserted Claims. Appx4024-Appx4025; Appx40 (annotated); *see also* Appx482.







Regarding the Figure 5C "cross over" spout embodiment, it forms a **spout 53** where **male zipper member 57** and the **female zipper member 58** engage, even when the mouth 52 is open. Appx50, 8:57-59; Appx41. "FIG. 5C shows a top view of the tumbler of FIG. 5A, wherein the zipper members cross over and remain engaged at the spouts." Appx48, 3:59-61; Appx41.

> FIG. 5C is a cross-sectional top view of an alternative tumbler 50 shown in FIG. 5A, wherein **male** and **female** zipper members **57** and **58** are shown. Similar to the embodiment shown in FIG. 5B, the male zipper member 57 is positioned just inside the mouth 52 and extends from one interior side of the tumbler 50 and the female zipper member 58 is positioned just inside the mouth 52 and extends from the other side of the tumbler 50. However, in this embodiment, the tips 59, formed at each end of the mouth 52, have relatively thin wall thicknesses and each tip 59 does not form an interior wall transverse to the axis of the mouth 52. The wall thicknesses in the region of the tip 59 is approximately the same as the side walls forming the mouth 52. ***The male and female zipper members 57 and 58 extend all the way to the most extreme ends of the tips 59 and "cross over" each other at the tips 59.*** The ends of the zipper members **57** and **58** are angled at about 45 degrees, so that when the zipper members **57** and **58** are closed together, they seal the zipper at the tips 59.



FIG. 5C

Appx50, 8:44-62 (emphasis added). Figure 5C identifies a **spout 53** where the **male zipper member 57** and the **female zipper member 58** "cross over." Appx41 (annotated).

SCJ's Accused Product has the same "cross over" spouts. SCJ's Accused Product forms a **"cross over" spout** where the **male zipper member** and the **female zipper member** engage, even when the mouth is open. Appx5203; Appx5204. Thus, the "cross over" spouts of SCJ's Accused Product infringe the "at least one flexible spout" of the Asserted Claims. Appx4024; Appx40 (annotated); *see also* Appx482.




### 3. *Under either construction, the District Court Disregarded Zip Top's Evidence of a "Spout"*

The District Court did not consider or analyze any of Zip Top's other evidence that the accused products have the claimed spout. *See* Appx8-Appx13. Zip Top's cross-motion for summary judgement pointed to evidence of each limitation of claims 1, 4, 5, 8, 9, and 12. Appx4033-Appx4038. This includes evidence of the claimed "spout" corresponding to claim elements reciting that term.

For context, independent claims 1 and 9 both recite methods directed to making a unitary whole container from cured silicone. Appx52, 11: 17-28; Appx52, 12:34-45. Both claims recite forming "a container portion defining a mouth, wherein the mouth has at least one flexible spout and first and second interior sides opposite

each other." Appx52, 11:29-31; Appx52, 12:46-48. SCJ produced two different sizes of its unitary whole, cured silicone containers, which were submitted to the District Court as physical exhibits 15 and 16. Appx535. The parties did not identify any differences between the two physical exhibits that impact the infringement analysis. These physical exhibits are sufficient evidence of infringement, especially where the claim term at issue—spout—is not a technical term. *See Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d 1361, 1369 (Fed. Cir. 2004) (expert testimony not necessary if the technology is "easily understandable").

Zip Top's cross-motion illustrates the defined mouth on a physical exhibit by outlining mouth of the open container with green lines and illustrates a flexible spout on each end of the mouth with red lines. This first set of views illustrate these features from a top-down perspective.





Appx4033-Appx4034. The right container is a physical exhibit, but the left container is an Endurable product that was modified in that the "glued" zipper member ends have been pulled apart at both spouts to allow visual inspection of the zipper member ends. The identified spout of the container focuses the flow of fluid like the spout of a pitcher as seen in screenshots of water being poured from the container.



Appx4281-Appx4283 (PSOF9); Appx4203, ¶5; Appx4214.




Appx4203, ¶5; Appx4214; *see also* Appx4212-Appx4215.

The next two figures from Zip Top's brief illustrate zoomed in views of the same two containers from above but looking towards the spout. Again, the right container is identical to physical exhibits 15 and 16, but the left container has been modified in that the "glued" zipper member ends have been pulled apart at both spouts to allow visual inspection of the zipper member ends. The green lines identify the mouth of the container and the red lines identify the flexible spout.





Appx4033-Appx4034; *see also* Appx5203; Appx5204. This evidence is not controverted by SCJ.

Similarly, independent claim 1 requires forming "a zipper portion comprising: a female zipper member . . . [and] a male zipper member." Appx52, 11:32-34, 47. ZT marshalled evidence of these elements. Appx4034-Appx4036. SCJ does not dispute that it forms the claimed zipper portion with female and male zipper members. Appx4248-Appx4249; Appx4279-Appx4281 (PSOF8). Claim elements 1F and 1J also recite a flexible spout in relation to the male and female zipper members. Appx52, 11:33-40, 11:47-55.

Claim element 1F requires a "female zipper member comprising . . . at least one female end section proximate the at least one flexible spout." Appx52, 11:34-40. ZT illustrated the end section (identified by a magenta shape) of the female zipper member of the SCJ container.



Appx4035; *see also* Appx5203; Appx5204. Additional annotated photos were included showing a view from above the containers facing the inside of the spout.



Appx4035; *see also* Appx5203; Appx5204.[1] These photos are identical with the only difference being that the photo on the left is annotated. The "glued" ends were pulled apart to better show the end section of the female zipper member. Here, the spout is identified by red lines so that the spout is illustrated as extending above and below the female zipper member.

Claim element 1J requires "the male zipper member comprising . . . at least one male end section proximate the at least one flexible spout." Appx52, 11:51-55. ZT illustrated the spout (identified by a red shape) in relation to the end section (identified by a blue shape) of the male zipper member.



[1] Note that the production containers made by SCJ have glue bonding the end of the male and female members together. Appx4020 ("the zipper members [are] bonded together"). The irregular surfaces of the ends of the male and female members is caused by residual bonding or "glue" material remaining after breaking the bond.

Appx4036; *see also* Appx5203; Appx5204. Additional annotated photos were included showing a view from above the containers facing the inside of the spout.



Appx4036; *see also* Appx5203; Appx5204. These photos were taken of a sample SCJ container that were pulled apart to better show the end section of the male zipper member, wherein the photos are identical save annotations. Here, ZT outlines the spout portion in red. Note that the spout is illustrated as extending above and below the male zipper member.

Independent claim 9 also requires forming "a zipper portion comprising: a female zipper member . . . [and] a male zipper member." Appx52, 12:51-57. ZT marshalled evidence of these elements. Appx4034-Appx4036. SCJ does not dispute that it forms the claimed zipper portion with female and male zipper members. Appx4248-Appx4249; Appx4279-Appx4281 (PSOF8). Claim elements 9F and 9G also recite a flexible spout in relation to the male and female zipper members. Appx52, 12:52-57.

Claim element 9F requires a "female zipper member extending from the first interior side of the mouth and tapering until it terminates at the at least one flexible spout." Appx52, 12:52-54. ZT illustrated the end section (identified by a magenta shape) of the female zipper member of the SCJ container.



Appx4035; *see also* Appx5203; Appx5204. Additional annotated photos were included showing a view from above the containers facing the inside of the spout.



Appx4035; *see also* Appx5203; Appx5204. These photos are identical with the only difference being that the photo on the left is annotated. The "glued" ends were pulled apart to better show the end section of the female zipper member. Here, the spout is identified by red lines so that the spout is illustrated as extending above and below the female zipper member.

Claim element 9G requires a "male zipper member extending from the first interior side of the mouth and tapering until it terminates at the at least one flexible spout." Appx52, 11:55-57. ZT illustrated the spout (identified by a red shape) in relation to the end section (identified by a blue shape) of the male zipper member.



Appx4036; *see also* Appx5203; Appx5204. Additional annotated photos were included showing a view from above the containers facing the inside of the spout.



Appx4036; *see also* Appx5203; Appx5204. These photos were taken of a sample SCJ container that were pulled apart to better show the end section of the male zipper member, wherein the photos are identical save annotations. Here, ZT outlines the spout in red. Note that the spout is illustrated as extending above and below the male zipper member.

Under the plain meaning construction, a "'spout' is a distinct feature designed to facilitate the pouring of liquid from a container." The above images and the physical exhibits that were before the District Court clearly show a "spout" that is a distinct feature designed to facilitate poring of liquid from a container much like the spout of a drink pitcher. Zip Top's evidence also shows water pouring in a focused manner through the spout to confirm that the spout facilitates the pouring of liquid. Appx4281-Appx4283 (PSOF9); Appx4088; Appx4203, ¶5; Appx4212-Appx4215.

In sum, the District Court clearly failed to consider and analyze this evidence of a spout and on that basis its non-infringement decision should be reversed.

Further, Zip Top's evidence establishes infringement and supports its cross-motion for summary judgment of infringement.

#### a) SC Johnson did not dispute Zip Top's evidence of a "spout" above and below the zipper members

As SCJ concedes, "summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Appx4231 (quoting *48*). SCJ knew it needed to specifically raise each non-infringement position ("put up or shut up") if it wished to convince a trier of fact of that position. And SCJ did so by challenging the spout limitations—"Elements [1C], [9D], [1F], [1J], [9F], [9G]"—only on the grounds raised in "Part II.B.1" of its brief. Appx4249; Appx4232-4236 (Part II.B.1). SCJ does not dispute (or even address) Zip Top's evidence of the spout below and above the zipper members and therefore failed to preserve an opportunity to rebut that evidence to a trier of fact or on appeal here.

#### b) Zip Top presented uncontroverted evidence of the mixing/molding element where SC Johnson only disputed the sufficiency of that evidence

In response to Zip Top's cross-motion for summary judgment of infringement, SCJ disputed the "spout" elements, as discussed above. SCJ also disputed one other limitation common to independent claims 1 and 9, the elements 1B and 9B. Appx4248-Appx4249. Elements 1B and 9B require "mixing a base-forming material

and a catalyst to make uncured silicone." Appx52, 11:22-23 (Claim 1), 12:39-40 (Claim 9). SCJ does not dispute Zip Top's evidence, but instead only challenges the sufficiency of that evidence. Appx4248-Appx4249 ("This conclusory statement does not provide adequate evidence."). However, Zip Top's evidence alone, and certainly when combined with SCJ's own summary judgment evidence, clearly establishes infringement of these elements.

ZT cites to the SCJ's product packaging, which reads "PLATINUM SILICONE Reusable, food grade silicone." Appx4033; Appx5203; Appx5204. SCJ does not dispute that its accused products are made from platinum silicone. Appx4248-Appx4249. In addition to Zip Top's evidence, SCJ identifies its base material as a [redacted] identified as [redacted]. Appx4775-Appx4776; Appx4247 n.10 (identifying the molding specification and the specification for the base material); Appx4308 (DSAF 1, 2, and 4). SCJ's exhibit confirms the base material is "[redacted] silicone . . . supplied as [redacted]". Appx4778. Neither the molding specification nor the specification for the base material mentions platinum as an ingredient. *See* Appx4775-Appx4776; Appx4778. However, the product describes its material as "platinum silicone" (Appx4023) and the '890 Patent explains how platinum is added as a catalyst in forming silicone products.

The ’890 Patent explains that food-grade silicone products were historically made with “methyl-vinyl-polysiloxane obtained by a process of cross-linking with platinum.” Appx47, 1:26-27. The patent incorporates by reference the disclosure of U.S. Patent No. 6,197,359 (the ’359 Patent) for this discussion. Appx47, 1:22. The ’359 Patent specification (incorporated by reference into the ’890 Patent) explains that “silicone is obtained by a cross-linking process with platinum” to speed the cross-linking reaction. Appx5199, 3:35–4:1. The ’359 Patent specification (incorporated by reference into the ’890 Patent) also explains “the use of platinum as a catalyst of the polymerization process does not generate decomposition by-products.” Appx5199, 4:1–3. This Court may also take judicial notice of FDA regulations describing platinum as a catalyst for silicone coatings used in food packaging. *See, e.g.*, 21 C.F.R. § 175.300 (defining an upper boundary of platinum when used as a catalyst for silicones).

In conclusion, the summary judgment record clearly establishes the use of a base silicone material. And clearly establishes the result of the manufacturing process is silicone containing platinum, which is a catalyst that speeds silicone curing. Thus, there is sufficient uncontroverted evidence to establish infringement of elements 1B and 9B of the ’890 Patent and this Court may reverse and render summary judgment of infringement. *See SCA Promotions, Inc. v. Yahoo!, Inc.*, 868 F.3d 378, 383 (5th Cir. 2017) (reversing denial of summary judgment and rendering

judgment on appeal); *see also Anderson*, 477 U.S. at 249 (non-movant must point to sufficient evidence showing there is a genuine issue for trial). In the alternative, this Court should reverse and issue a limited remand for fact finding on the narrow issues of infringement not decided by the District Court in the first instance.

## V. CONCLUSION

The District Court erred by narrowly construing "spout" to exclude the preferred embodiments of Figures 5B and 5C and granted summary judgment of non-infringement based on that erroneous construction. The District Court further erred by failing to consider ZT's additional evidence of infringement, including evidence of a spout extending above and below the zipper elements. On either or both bases, this Court should reverse the summary judgment.

In addition, ZT cross-moved for summary judgment of infringement based on physical evidence, documentary evidence, and a clear explanation of how each element is infringed. Because SCJ failed to produce evidence raising a genuine issue of material fact, this Court should render judgment of infringement.

In the alternative, this Court should remand for narrow fact finding on the "spout" and/or the mixing/molding element only.

Dated: June 7, 2024

/s/ *R. William Beard, Jr.*
R. William Beard, Jr.
Counsel for Appellant Zip Top, Inc.

# ADDENDUM

ILND 450 (Rev. 04/29/2016) Judgment in a Civil Action

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**

Zip Top, Inc.

Plaintiff(s),

v.

S.C. Johnson & Son, Inc,

Defendant(s).

Case No. 22 C 5028
Judge Jorge L. Alonso

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff(s)
and against defendant(s)
in the amount of $

which ☐ includes pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☑ in favor of defendant(s) S.C. Johnson & Son Inc.
and against plaintiff(s) Zip Top, Inc.

Defendant(s) shall recover costs from plaintiff(s).

---

☐ other:

---

This action was *(check one)*:

☐ tried by a jury with Judge presiding, and the jury has rendered a verdict.
☐ tried by Judge without a jury and the above decision was reached.
☑ decided by Judge Jorge L. Alonso on a motion.

Date: 3/11/2024

Thomas G. Bruton, Clerk of Court

Lesley Fairley , Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ZIP TOP, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 22 C 5028** |
| | ) | |
| **v.** | ) | |
| | ) | **Judge Jorge L. Alonso** |
| **S.C. JOHNSON & SON, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant, S.C. Johnson & Son, Inc., sells certain reusable freezer- and oven-safe zippered silicone containers called Ziploc Endurables. Plaintiff, Zip Top, Inc., claims that these containers infringe certain patents assigned to plaintiff, which disclose a zippered silicone "foodstuff container," U.S. Patent No. 11,358,755 ("the '755 patent"), and a process for making such a container, U.S. Patent No. 11,383,890 ("the '890 patent'). The parties have filed cross-motions for summary judgment on the issue of infringement and whether the '755 patent is invalid for indefiniteness. For the following reasons, the Court grants defendant's motion on the infringement issue and denies plaintiff's.

## I. Background

Plaintiff sells a line of food storage container products that, plaintiff contends, embody the patents-in-suit. (*See* Pl.'s LR 56.1 Resp. ¶ 24, ECF No. 60.)

### A. The '890 Patent

The '890 patent includes twenty claims for "silicone container making processes." (Pl.'s LR 56.1 Resp. ¶ 13.) Claim 1 describes a process for making a molded silicone "unitary whole container comprising: a container portion defining a mouth, wherein the mouth has at least one

flexible spout and first and second interior sides opposite each other; [and] a zipper portion comprising: a female zipper member comprising . . . at least one female end section proximate the at least one flexible spout and . . . a male zipper member . . . comprising . . . at least one male end section proximate the at least one flexible spout." (*Id.* ¶ 14.) Claim 9 describes a similar process for making a molded silicone container "comprising: a container portion defining a mouth, wherein the mouth has at least one flexible spout" and a "zipper portion comprising: a female zipper member" that "terminates at the at least one flexible spout; and a male zipper member" that "terminates at the at least one flexible spout." (*Id.*) All other asserted claims are dependent on either Claim 1 or Claim 9; therefore, all claims require a container mouth with "at least one flexible spout." (*Id.* ¶ 16.)

The patent includes several drawings of embodiments of the invention, which the specification variously identifies as containers, bowls, or tumblers. One embodiment, a tumbler, is represented by Figures 5A, 5B, and 5C. The specification describes this embodiment as having tips that function as "handles" for the user to hold while closing the zipper members, which "cross over" one another so that the zipper elements completely engage at the tips, even when the mouth is open, and "the mouth forms a spout at each tip." (Def.'s LR 56.1 Stmt. Ex. 1, Dryden Decl., Ex. 1, '890 Patent at col. 8 ll. 30-43, ECF No. 48-1.) Two alternative embodiments, also referred to as tumblers, are depicted in Figures 7A-7D and 6A-6G. In each of these embodiments, the zipper members "do not interfere with the spout" (*id.* at col. 10 ll. 61-63), which "allows a fluid contained within the tumbler to be poured out of either spout without flowing over either of the male and female zipper members," which prevents "debris and residue" from "becom[ing] lodged in the channel" (*id.* at col. 10 ll.5-12, col. 10 l. 66–col. 11 l. 6).

The Merriam-Webster dictionary defines a spout, in relevant part, as "a projecting tube or lip from which a liquid (such as water) issues." (Pl.'s LR 56.1 Resp. ¶ 20.) Similarly, Dictionary.com defines a spout, in relevant part, as "a pipe, tube, or liplike projection through or by which a liquid is discharged, poured or conveyed." (*Id.*)

**B. The '755 Patent**

The '755 patent includes nineteen claims for a zippered "flexible foodstuff container." Among the asserted claims are three independent claims, Claims 1, 15, and 18. Each of these claims describes a "sealable container comprising:" a base and sides that allow the container to stand on its own while open and a zippered mouth, "wherein at the first and second tips, ends of the first and second zipper members are angled at about 45 degrees, so that when the zipper members are engaged, they seal the mouth at the tips." (Pl.'s LR 56.1 Resp. ¶ 28.) Thus, all asserted claims require the "ends of the . . . zipper members" to be "angled at about 45 degrees, so that when the zipper members are engaged, they seal the mouth at the tips." (*Id.* ¶ 30.)

During prosecution, the patent's proposed language was amended to include the 45-degree-angle limitation to distinguish the claims over prior art. (*Id.* ¶ 36.) In its first instantiation, this limitation referred to "angles of about 45-degrees between the first and second sides," located at "the first and second tips." (*Id.* ¶ 38.) In subsequent versions, the proposed claims continued to refer to a 45-degree angle between the "sides" of the container. (*Id.* ¶ 39.) The examiner, however, rejected the claims for, among other reasons, lack of written description supporting the 45-degree-angle limitation. (*Id.* ¶ 41.) This rejection resulted in another amendment, in which the claims took essentially their final form, referring to angled "ends," rather than sides. (*Id.*)

## II. Analysis

Defendant moves for summary judgment of noninfringement and invalidity due to indefiniteness, and plaintiff cross-moves for summary judgment on the infringement issue. For purposes of the present motions, defendant disputes only two claim limitations: the "spout" limitation of the '890 patent and the "angled at about 45 degrees" limitation of the '755 patent.

### A. Legal Standards for Summary Judgment on Patent Infringement Claim

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). The Court applies these "ordinary standards for summary judgment" in the same way whether one or both parties move for summary judgment; when the parties file cross-motions, the Court treats each motion individually, "constru[ing] all facts and inferences arising from them in favor of the party against whom the motion under consideration is made."

*Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017); *see Reeder v. Carter*, 339 F. Supp. 3d 860, 869-70 (S.D. Ind. 2018).

The Patent Act provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). "A determination of infringement generally requires a two-step analysis—the court first determines the scope and meaning of the claims asserted, and then the properly construed claims are compared to the allegedly infringing device." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1350 (Fed. Cir. 2022). "Literal infringement exists when every limitation recited in the claim is found in the accused device." *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1341 (Fed. Cir. 2016).

The first step of the infringement analysis, known as claim construction, is the threshold "process of giving proper meaning to the claim language," *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997), which "defines the scope of the protected invention," *Bell Comm'ns Rsch., Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 619 (Fed. Cir. 1995).[1] Claim construction is an issue of law for the Court to decide. *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1315 (Fed. Cir. 1999).

Claim construction begins with analysis of the "words of the claims themselves, both asserted and nonasserted." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.

---

[1] The "claim" is the part of the patent "particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). It is the concluding portion of the "specification," the part of the patent that contains "a written description of the invention, and of the manner and process of making and using it." 35 U.S.C. § 112(a); *see* 35 U.S.C. § 111(a)(2), 35 U.S.C. § 154(a)(4). The patents-in-suit also include "drawing[s]" to aid in "understanding . . . the subject matter sought to be patented." 35 U.S.C. § 113; *see* 35 U.S.C. § 154(a)(4).

1996). The terms of a claim are to be given "their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. But courts must carefully "review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics*, 90 F.3d at 1582. "[A] patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Id.* The specification is usually "dispositive" of the claim construction issue; "it is the single best guide to the meaning of a disputed term. *Id.* If the specification is not dispositive on its own, courts may go on to consider the "prosecution history of the patent," which is "the complete record of all the proceedings before the Patent and Trademark Office." *Id.*

After considering the evidence "intrinsic" to the patent, as enumerated above, the Court may also consider "extrinsic" evidence, such as "expert and inventor testimony, learned treatises," and "dictionaries, especially technical dictionaries." *Phillips*, 415 F.3d at 1317 (cleaned up). Such evidence can help the Court to understand "the background science or the meaning of a term in the relevant art." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015).

"Where the parties do not dispute any relevant facts regarding the accused product, . . . but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment." *Gen. Mills, Inc. v. Hunt-Wesson, Inc.*,

103 F.3d 978, 983 (Fed. Cir. 1997); *see Zelinski v. Brunswick Corp.*, 996 F. Supp. 757, 759 (N.D. Ill. 1997), *aff'd,* 185 F.3d 1311 (Fed. Cir. 1999).

**B. Infringement of the '890 Patent—"Spout"**

According to defendant, the Ziploc Endurables product, unlike plaintiff's products and unlike the invention claimed in the '890 patent, does not have a spout. Defendant posits, and plaintiff admits, that a "spout," given its plain and ordinary meaning, is a "distinct feature that directs liquid from and facilitates the pouring of fluid from a container." (Pl.'s LR 56.1 Resp. ¶ 20; Pl.'s Mem. in Supp. of Cross-Mot. and Resp. Br. at 4 n.1, ECF No. 59.) Far from "facilitat[ing] . . . pouring," defendant argues, the zipper members of the Ziploc Endurables product are bonded together with silicone to *prevent* leakage. (Pl.'s LR 56.1 Resp. ¶¶ 56-57.) Therefore, defendant submits, the accused product contains no spout, and its product does not infringe the '890 patent.

Plaintiff responds that this argument relies on a faulty construction of the term "spout." According to plaintiff, the fact that the bonded silicone at the tips of the accused product may, in some sense, obstruct flow from the container does not mean that there is no "spout." Plaintiff argues that the zipper members of the embodiment depicted in Figures 5B and 5C of the '890 patent cross over one another in the same fashion as the zipper members of the accused product. Further, plaintiff submits images showing that water can be poured out of the accused product by holding it by the tabs and tipping it. (Finell Decl. Ex. A, ECF No. 62 at 10-13.) Therefore, plaintiff concludes, the Court should construe "spout" as "a distinct feature that directs liquid from and facilitates the pouring of fluid from a container, *including* spouts with 'cross-over' zipper members (Figures 5A-5C) and spouts with non 'cross-over' zipper members (Figures 6A-6G and 7A-7D), and unobstructed or unimpeded fluid flow is not required." (Pl.'s Reply Br. at 2, ECF No. 77 (emphasis added).)

First, the Court agrees with the parties that the term "spout" is properly construed as a "distinct feature that directs liquid from and facilitates the pouring of fluid from a container." This is consistent with the plain and ordinary meaning of the word, and no party has pointed to any evidence, intrinsic or extrinsic, to suggest that this ordinary meaning does not apply here.

The Court does not agree with plaintiff that it should add to this construction the qualification that the term "include[s]" spouts with or without cross-over zipper members that may or may not obstruct or impede the flow of fluid. Defendant calls plaintiff's lengthy discussion of the cross-over zipper members a "boondoggle" and a "sideshow" (Def.'s Combined Reply and Opp'n Br. at 6, ECF No. 66), and the Court agrees with defendant that these terms are appropriate. The fundamental flaw in plaintiff's argument is that, without any explanation or justification, plaintiff treats the cross-over zipper members mentioned in relation to the embodiment depicted in Figures 5A-5C of the '890 patent as *part of the spout*, rather than as separate elements of the patented invention, which happen to be *adjacent to the spout* in that embodiment. Or, as defendant aptly puts it, "the zipper members do not *form* the spout—they are used *in conjunction with a spout*." (*Id.* at 7.)

It is clear from the plain language of the two independent claims at issue, Claim 1 and Claim 9, that the zipper members are not part of the spout. Both claims refer to a "unitary whole container" product comprising (1) a "container portion defining a mouth" that "has at least one flexible spout" and (2) a "zipper portion comprising" a "female zipper member" and a "male zipper member." ('890 Patent col 11 ll. 27-55, col. 12 ll. 44-57.) The zipper members are not in the same "portion" of the claimed "unitary whole container" as the spout, so they are not part of the spout.

Subsequent language in each claim reinforces this reading. In Claim 1, each of the zipper members has an "end section proximate the at least one flexible spout." Neither party mentions

the tortured syntax of this phrase, but, whatever it means for the "end section[s]" of the "zipper member[s]" to be "proximate the at least one flexible spout," that bizarre phrase makes clear that the zipper members are one thing and the spout is a separate, "proximate" thing. (*Id.* at col. 11 ll. 34-55.) Similarly, in Claim 9, each of the zipper members "terminates at the at least one flexible spout." If they "terminate" at the spout, they are not part of the spout. (*Id.* at col. 12 ll. 52-57.)

This interpretation of the plain language of the claims is confirmed by the '890 patent's specification and drawings. According to the specification, it is the "mouth," not the "zipper members," that "forms" the "spout." ('890 Patent at col. 8 ll. 42-43.) Each embodiment depicted in the patent, including the embodiment depicted in Figures 5A, 5B, and 5C, includes a distinct, approximately V-shaped or "liplike" (Pl.'s LR 56.1 Resp. ¶ 20) feature at each tip, separate from the zipper members, that resembles what anyone would call the spout of a pitcher or like container, and it is shaped as if to facilitate pouring in the same manner.

Plaintiff focuses on Figures 5B and 5C, which seem to show zipper members extending from one end of the container to the other, with a "spout" near where they join, toward the tips:



FIG. 5B



FIG. 5C

However, as defendant correctly explains, these are "cross-sectional top view[s]" ('890 Patent at col. 8 ll. 21, 44) of the same embodiment depicted in Figure 5A, which depicts a spout feature that




FIG. 5A

appears to be separate from the zipper members. For these drawings, the specification defines reference numeral 52 as the "mouth," numeral 53 as the "spout" at the tips when the "mouth" is open, and numerals 57 and 58 as the "zipper members." (*Id.* at col. 7 l. 48, col. 8 ll. 22-23, 43.) When Figures 5B and 5C are compared with Figure 5A, it is clear that the "spout" at 53 is separate from and above the "zipper members" at 57 and 58, although it may appear otherwise from a cross-sectional top view.

This becomes even clearer by reviewing drawings of other embodiments, such as in Figure 6A and Figure 7A, which, like Figure 5A, are perspective views—not top views—of similarly shaped tumblers with evident spout features. In Figures 6A and 7A, the zipper members are more pronounced, and they are labeled with reference numerals, so it is clearer than in Figure 5A where in the container they are located; and they do not appear to form part of the spout. Further, it is clear from the written description of these drawings that the zipper members and spout are separate elements, particularly where the text states that, in these two embodiments, the "zipper members do not interfere with the spouts." (*Id.* at col. 10 l. 63.) The zipper members could hardly "interfere" (or not) with the spout if they are part of the spout.

And if the applicant who sought the '890 patent intended for the term "spout" to include the zipper members, a definition that would have added an element not carried by the ordinary meaning of the word, she had to clearly articulate that definition. *See Thorner v. Sony Computer*

*Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning.") (internal quotation marks omitted). "It is not enough for a patentee to simply . . . use a word in [a certain] manner in [any or] all embodiments[;] the patentee must clearly express an intent to redefine the term." *Id.* (internal quotation marks omitted). Plaintiff's attempt to reverse-engineer a new definition of "spout" by pointing to the drawings in Figures 5B and 5C is not convincing, when Figure 5A shows that the same embodiment depicted in those figures has a "spout" feature that is separate from the zipper members. *See id.* at 1367-68 ("[T]he implied redefinition must be so clear that it equates to an explicit one.") (internal quotation marks omitted).

Based on the claim language, the drawings, the written description, and the entire specification, it appears that, whether the zipper members cross over, engage, or disengage at the spouts in an open configuration, the zipper members are not the spout or part of it; rather, the spout is a separate feature. Thus, the Court construes the term "spout" to mean a "distinct feature that directs liquid from and facilitates the pouring of fluid from a container." The Court does not construe the term "spout" to include the zipper members, which are a separate element of the invention.

Having construed the disputed claim term, the Court turns to the second step in the infringement analysis: comparing the properly construed claims to the accused product. The comparison is simple: it requires only the briefest examination of the Ziploc Endurables products to see that they contain no distinct feature that can be fairly described as directing liquid from the container and facilitating the pouring of fluid from it. (Pl.'s LR 56.1 Resp. ¶¶ 54, 69 (including photographs of the accused product); *see id.* ¶¶ 45-52 (same, from different angles); Dryden Decl. Exs. 15 & 16 (product samples).) Plaintiff insists that the point at which the zipper members cross

over is a "spout," but this is not a "distinct" feature that "directs liquid from" the container or "facilitates the pouring of fluid" from it; at best, it permits the pouring of fluid when the open container is tipped to the side. Of course, the fact that one *can* pour fluid out of a Ziploc Endurables container does not mean that any part of the container over which the fluid passes is a spout; one can pour fluid out of any open container, no matter how it is shaped or designed, regardless of whether it has a spout.

Infringement, unlike claim construction, is a question of fact. *Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 949 (Fed. Cir. 2016). This dispute concerns the interpretation of the claim, not any material facts regarding the accused product, so "the question of literal infringement collapses into claim construction and is amenable to summary judgment." *See Zelinski*, 996 F. Supp. at 759 (citing *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996)). After properly construing the term "spout," there is no genuine dispute of material fact that the accused product does not contain a "spout"; no reasonable juror could find otherwise. Because the "spout" limitation is included in each of the asserted claims, but not in the accused product, defendant is entitled to summary judgment on the issue of infringement of the '890 patent.

**C. Infringement of the '755 Patent—"Angled at About 45 Degrees"**

Defendant argues that it is entitled to summary judgment on the issue of infringement of the '755 patent because plaintiff has not come forward with evidence to establish that the accused product includes zipper members that are "angled at about 45 degrees" at the tips.

There appears to be no need to construe these claim terms, apart from giving them their plain and ordinary meaning. The parties agree that an angle is the space between two intersecting lines (Pl.'s LR 56.1 Resp. ¶ 32), and "about 45 degrees" identifies the claimed angle with near-mathematical precision. The Court has no need to go further. *See Vivid Techs., Inc. v. Am. Science*

*& Eng'g*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy."); *see also Saso Golf, Inc. v. Nike, Inc.*, No. 08 C 1110, 2013 WL 4804835, at *5 (N.D. Ill. Sept. 9, 2013) (finding no need to construe "radius of curvature," a "defined mathematical term determined by a defined formula that can be applied to any curve" and was "not of the inventor's making").

The next step, comparing the claim to the accused product, is trickier because plaintiff never clearly explains where to find the claimed angle of about 45 degrees in the accused product. Plaintiff's position on where to locate the infringing 45-degree angle has shifted throughout this litigation, but it seems to have come to rest on comparing the following images. The first is of Figure 8 of the '755 patent (*see* ECF No. 48-2 at 21); the second is a photograph of the accused product, with lines drawn on the image, which purport to represent the crossing zipper members and the approximately 45-degree angle formed where they join (Def.'s LR 56.1 Resp. ¶ 10, ECF No. 68; Pl.'s Mem. in Supp. of Cross-Mot. and Resp. Br. at 28, ECF No. 59 at 33).




FIG. 8




Defendant argues, however, that the lines drawn on the photograph (as shown at left) do not accurately represent the features of the accused product. In the photograph, the lines plaintiff has drawn to represent the zipper members suggest that the zipper members have identically shaped, pointed ends that join together at a point that plaintiff represents to be the vertex of the purported 45-degree angle.[2] But defendant's expert witness, Tim A. Osswald, a professor of mechanical engineering, proposes to testify that, based on Computer Aided Design ("CAD") files of the accused containers (which were produced to plaintiff in this litigation) as well as defendant's internal schematics, the accused product's zipper members do not have pointed ends angled at about 45 degrees. (Osswald Reply Decl. ¶¶ 18, 20, ECF No. 67.)



Instead, as the CAD image (at right) shows, the zipper members are curved, and they terminate in a flat, blunt face, not a pointed end. (Pl.'s LR 56.1 Resp. ¶ 28, ECF No. 80 (citing Osswald Reply Decl. ¶ 18 and Dryden Reply Decl. Ex. 3, ECF No. 71-2.).)

---

[2] In fact, the angle in the photograph is more than fifty degrees, but the Court assumes that this is close enough to qualify as "about" 45 degrees. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1369 (Fed. Cir. 2005) (holding that the term "about" should generally "be given its ordinary meaning of 'approximately,'" not construed to mean "exactly"). The Court also notes parenthetically that this photograph, which appears in several places in plaintiff's summary judgment materials, is sometimes distorted so that the angle appears to be as much as sixty-seven degrees. Again, the Court assumes, for present purposes, that the angle depicted here is "about" 45 degrees.

Additionally, the zipper members are not identical in shape relative to one another. They are curved on the inner face, and straight on the outer face, which means, according to Mr. Osswald, that they cannot be "overlaid to produce a joined profile"; instead, "their joined profile would be a new shape that matches neither zipper member end's profile," and does not form a pointed end. (Osswald Reply Decl. ¶ 19, ECF No. 67; *see id.* ¶ 20.) Therefore, Mr. Osswald concludes, there is no measurable "angle" at all at the ends of the zipper members where they engage, and to the extent there is an angle, it is at least seventy-three degrees, which is not "about" forty-five degrees. (*See id.* ¶¶ 20-21; *see also* Pl.'s LR 56.1 Resp. ¶ 24, ECF No. 80 (admitting that an "angle measuring 'about 67 degrees' does not measure 'about 45 degrees'").)

Plaintiff does not dispute any of this, except to cite defendant's Exhibits 15 and 16—which are physical samples of the small and medium versions of the accused products. (Pl.'s LR 56.1 Resp. ¶¶ 25-33.) Nor does plaintiff make any argument in reply, except similarly to point to the photograph of the accused product and the physical samples again. (*See* Pl.'s Reply Br. at 11-12, ECF No. 77.) But merely viewing the accused product or a photo of it with the naked eye does not reveal whether the zipper members are "angled at about 45 degrees" where they engage at the tips, as the claim language of the '755 patent requires,[3] and plaintiff has not explained how a jury could

[3] Additionally, the Court notes that a product "does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim." *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1327 (Fed. Cir. 2013). Plaintiff does not argue that the patent is infringed because it is possible to contort the silicone product in some way that puts the zipper members at a forty-five-degree angle, nor could it, not only because of the above-cited authority, but also because it appears to have disclaimed that position during the patent prosecution process. (*See* Pl.'s LR 56.1 Resp. ¶ 41 (citing Dryden Decl. Ex. 4, ECF No. 48-6 at 82 (deleting claim language that described "tips compris[ing] silicone . . . that allows the first and second corners to deform from angles of about 45 degrees to angles of about 0 degrees" and replacing it with the language at issue here)).)

conclude that the zipper members are so angled, despite the contrary evidence proffered by defendant. *See Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1022 (7th Cir. 2018) (explaining that "the non-movant must set forth specific facts demonstrating a genuine issue for trial," and pointing to evidence of a mere "'metaphysical doubt' is insufficient" to do so) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *see also Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 887 (7th Cir. 2023) (explaining that, at summary judgment, a district court need not "disbelieve defendants' proffered evidence simply because [the plaintiff]—without proof—asserts it is false," where the plaintiff does not also come forward with "specific facts" to refute it) (internal quotation marks omitted) (citing *Carroll v. Lynch*, 698 F.3d 561, 565 (7th Cir. 2012), and *Matushita*, 475 U.S. at 587), *vacated on other grounds on denial of reh'g,* No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023). Plaintiff has not come forward with evidence sufficient to permit a reasonable factfinder to find in its favor on this issue of material fact. *See Traxcell Techs., LLC v. Sprint Commc'ns Co. LP*, 15 F.4th 1121, 1130 (Fed. Cir. 2021) (citing *Novartis Corp. v. Ben Venue Lab'ys, Inc.*, 271 F.3d 1043, 1054 (Fed. Cir. 2001) (affirming summary judgment of non-infringement because patentee did not "meet obligation to set forth the detailed basis of its evidence such that the district court could evaluate whether it could support a finding of infringement")); *see also Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2015 WL 1543262, at *19 (N.D. Ill. Mar. 31, 2015) (granting summary judgment of infringement because "Defendants offer evidence that this [claimed element] is absent in the disclosed structures, and Plaintiffs produce nothing in response."); *Lamoureux v. AnazaoHealth Corp.*, No. 03CV1382, 2012 WL 12537933, at *26 (D. Conn. Sept. 24, 2012) (explaining that plaintiffs' "speculation" as to nature of accused product did not create a genuine

issue of material fact that would permit a jury to find for plaintiffs on issue of infringement) (citing *Matsushita*, 475 U.S. at 586).

"[A] grant of summary judgment of noninfringement is proper when no reasonable factfinder could find that the accused product contains every claim limitation or its equivalent."[4] *Medgraph*, 843 F.3d at 949. Plaintiff has not come forward with sufficient evidence to permit a reasonable factfinder to find that the accused product has either a "spout" or zipper members that are "angled at about 45 degrees," as required by the '890 and '755 patents, respectively. Because plaintiff cannot show that the accused product contains these limitations, summary judgment for defendant on the issue of infringement is appropriate.

**D. Invalidity for Indefiniteness**

Given the Court's conclusion on the infringement issue, the Court need not reach the invalidity issue to resolve defendant's motion for summary judgment, and plaintiff has not cross-moved for a ruling on that issue. "Granting summary judgment based on non-infringement generally does not moot a counterclaim based on invalidity, *see Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1348-49 (Fed. Cir. 2005) . . . but this court still has discretion to not consider [defendant's] request for a declaratory judgment" of indefiniteness. *Wells-Gardner Elecs. Corp. v. C. Ceronix, Inc.*, No. 10 C 2536, 2011 WL 1467182, at *3 (N.D. Ill. Apr. 14, 2011) (citing

---

[4] The Court notes parenthetically that defendant argued in its opening brief that plaintiff has not set forth sufficient evidence to support a jury verdict of either literal infringement or infringement under the doctrine of equivalents. *See Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004); *Zelinski*, 185 F.3d at 1317. Plaintiff has not responded to defendant's argument under the doctrine of equivalents, and has therefore forfeited that ground. *Bishop v. Air Line Pilots Ass'n, Int'l*, 511 F. Supp. 3d 830, 847 (N.D. Ill.), *aff'd,* 5 F.4th 684 (7th Cir. 2021); *Johnson v. Trans Union, LLC*, No. 10 C 6960, 2012 WL 983793, at *8 (N.D. Ill. Mar. 22, 2012), *aff'd,* 524 F. App'x 268 (7th Cir. 2013). Forfeiture aside, plaintiff has not come forward with sufficient evidence to support a finding in its favor on that issue, so summary judgment for defendant is appropriate. *See Centricut*, 390 F.3d at 1370; *Zelinski*, 185 F.3d at 1317.

*Phonometrics, Inc. v. N. Telecom, Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998)). "While the better practice is to treat both the validity and infringement issues, . . . it is not always necessary to do so," particularly where "noninfringement is clear and invalidity is not plainly evident." *Leesona Corp. v. United States*, 530 F.2d 896, 906 n.9 (Ct. Cl. 1976) *cited in Phonometrics*, 133 F.3d at 1468.

This is a case in which "noninfringement is clear and invalidity is not plainly evident." *Id.* A claim is invalid for indefiniteness only if, when "read in light of the specification" and "prosecution history," it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The Court finds nothing so vague about the claim language concerning zipper members that are "angled at about 45 degrees at the tips," as to plainly suggest indefiniteness. If anything, the claim language is *too* clear for plaintiff's purposes: it describes zipper members that form a particular shape, and plaintiff has not adduced evidence sufficient to show that the zipper members of the accused product form that shape. Therefore, the Court grants summary judgment for defendant on the infringement issue, denies summary judgment for plaintiff on that issue, and declines to decide the issue of invalidity of the '755 patent for indefiniteness.

**E. Motions to Seal**

Finally, the parties have moved to seal a number of documents filed in support of their summary judgment motions. Plaintiff moves to seal schematic diagrams of the accused product, on the ground that the diagrams were produced by defendant and designated by defendant as "confidential, attorney eyes only." (Pl.'s Apr. 20, 2023 Mot. to Seal, ECF No. 64.) Further, plaintiff moves to seal its entire Local Rule 56.1(b)(3) statement of additional facts because it contains these schematic diagrams. (Pl.'s Jun. 1, 2023 Mot. to Seal, ECF No. 78.) Defendant, for its part,

moves to seal its combined reply/response brief (ECF No. 66), its Local Rule 56.1(b)(2) response to plaintiff's statement of facts (ECF No. 68), its Local Rule 56.1(b)(3) statement of additional material facts (ECF No. 69), Exhibits 1, 3-8, and 10 to the declaration of one of its attorneys in support of its combined reply/response brief (ECF No. 71), and the declaration of its expert witness, Tim Osswald, in support of its combined reply/response brief (ECF No. 67). (Def.'s May 18, 2023 Mot. to Seal, ECF No. 72.) Defendant states in support of the motion to seal only that "[g]ood cause exists for keeping these documents under seal, which contain highly confidential competitive, sensitive strategic, and financial business information of Defendant." (Def.'s Mot. to Seal ¶ 11.)

As an initial matter, these motions to seal are not procedurally proper. Under Local Patent Rule 1.4, the protective order found in Appendix B to the local patent rules applies automatically, by default. The default protective order permits parties to designate information produced in discovery as "confidential" or "highly confidential," which imposes certain obligations on the parties to restrict access to and disclosure of such documents. However, paragraph 6.a. of the protective order states that the order "does not, by itself, authorize the filing of any document under seal." To file such confidential documents under seal, a party must "move the Court, consistent with Local Rule 26.2(b) . . . for permission." Local Rule 26.2(b) states that no document may be filed under seal without "order of court . . . except that a document may provisionally be filed under seal pursuant to subsection (c) below." Local Rule 26.2(c), in turn, provides that any party filing a motion to seal electronically must "(1) provisionally file the document electronically under seal; (2) file electronically at the same time a public-record version of the brief, motion, or other submission with only the sealed document excluded; and (3) move the court for leave to file the document under seal." The parties have not filed public-record versions of these documents that

leave the substance of the documents open to public view and reasonably redact only the confidential or highly confidential information; instead, they have moved to seal lengthy court documents in their entirety.

To the extent the parties have filed such lengthy documents under seal in the belief that they contain confidential information from start to finish, the Court is highly skeptical. At the very least, the parties have not made the showing necessary to maintain these documents under seal in their entirety. Litigation in federal courts is presumptively public, and people who "call on the courts . . . must accept the openness that goes with subsidized dispute resolution." *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 567-68 (7th Cir. 2000) ("Many a litigant would prefer that the subject of the case . . . be kept from the curious (including its business rivals and customers), but the tradition that litigation is open to the public is of very long standing."). "[O]nly trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence . . . is entitled to be kept secret." *Baxter Int'l v. Abbott Lab'ys*, 297 F.3d 544, 546 (7th Cir. 2002). "Secrecy is fine at the discovery stage, before the material enters the judicial record. But those documents, usually a small subset of all discovery, that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality." *Id.* at 545 (internal citation omitted). "The rights of the public kick in when material produced during discovery is filed with the court." *Bond v. Utreras*, 585 F.3d 1061, 1075 (7th Cir. 2009).

The Court looks to defendant, as the party who designated this information as confidential, for an explanation of why these documents are properly maintained under seal. Defendant has made no attempt to show how and why the standards set forth in *Union Oil* and *Baxter* are met here, and it has certainly not shown why entire briefs and lengthy Local Rule 56.1 statements must

remain under seal. *See Tufco LP v. Reckitt Benckiser (ENA) BV*, No. 21-C-1199, 2022 WL 1289320, at *1 (E.D. Wis. Apr. 29, 2022) (motions to restrict access to "entire pleadings and briefs" are "grossly overbroad[,] . . . absent unusual circumstances") (citing *Union Oil*, 220 F.3d at 567). "Claims of confidentiality must be specifically justified." *DuraSystems Barriers Inc. v. Van-Packer Co.*, 666 F. Supp. 3d 749, 757 (C.D. Ill. 2023) (citing *Baxter*, 297 F.3d at 546); *see Gove v. Sargento Foods, Inc.*, No. 18-CV-1335-PP, 2023 WL 3953287, at *5 (E.D. Wis. June 11, 2023). "A motion to seal thus has 'no prospect of success' unless it analyzes 'in detail, document by document, the propriety of secrecy, providing reasons and legal citations.'" *Mercasia USA Ltd. v. 3BTech, Inc.*, No. 3:17-CV-718 JD, 2022 WL 872735, at *3 (N.D. Ind. Mar. 24, 2022) (citing *Baxter*, 297 F.3d at 548). There is no such painstaking analysis here, nor is any proper basis for keeping this information under seal obvious to the Court. "Commercially sensitive information can be kept secret at the discovery stage, but general interests in commercial advantage and privacy aren't sufficient reasons to keep information relevant to judicial decision-making secret." *Palacio v. Med. Fin. Sols.*, No. 21 CV 1288, 2022 WL 2132505, at *2 n.4 (N.D. Ill. June 14, 2022) (citing *Baxter*, 297 F.3d at 545). Merely "[l]abeling . . . information 'sensitive,'" *Kotoklo v. Karpinski*, No. 20-CV-0635, 2021 WL 4516362, at *2 (N.D. Ill. Apr. 12, 2021), or "asserting that a disclosure of the information 'could' harm a litigant's competitive position is insufficient; the motion must explain how." *Gordon v. Menard, Inc.*, No. 23 C 317, 2023 WL 6619427, at *2 (N.D. Ind. Oct. 10, 2023) (cleaned up).

The Court has relied (at least in part) on the documents defendant asks the Court to seal in rendering this decision, so "the strong presumption of public disclosure applies." *Baxter*, 297 F.3d at 548. If defendant wanted to keep all of these documents secret, it "should not have proffered them in response to [plaintiff's] motion" or in support of its own motion. *See In re Specht*, 622

F.3d 697, 701 (7th Cir. 2010). "Because the motions to seal do not contend that the standards of *Baxter* and *Union Oil* have been satisfied, they are denied." *Id.*

The Court has considered simply ordering these documents unsealed, but, in an abundance of caution, the Court will give defendant an opportunity to file a renewed motion that properly demonstrates that the information within its scope meets the above standards and is entitled to be kept under seal. The Court will keep the documents provisionally under seal for a period of seven days from the date of this Memorandum Opinion and Order. Defendant may file a renewed, properly supported motion to seal by that date, if desired. Otherwise, the Court will direct the Clerk to unseal the documents.

## III. Conclusion

For the reasons set forth above, the Court denies plaintiff's motion [58] for summary judgment. The Court grants defendant's motion [45] for summary judgment on the infringement issue; the Court denies the motion without prejudice as to the invalidity issue. The Court finds and declares that defendant's Ziploc Endurables products do not infringe plaintiff's '890 or '755 patents. Documents [59], [60], [61], and [62], which are submitted in support of plaintiff's cross-motion but are erroneously docketed as motions although they seek no separate relief, are denied as moot. The motions to seal [64], [72], and [78] are denied. Documents [63], [66], [68], [69], [71], and [80] will remain provisionally under seal for a period of seven days from the date of this Memorandum Opinion and Order. After that period expires, the Court will unseal the documents, unless defendant files a renewed motion to seal meeting the standards set forth herein. Defendant's remaining counterclaims are dismissed without prejudice. Civil case terminated.

**SO ORDERED.**

**ENTERED: March 7, 2024**

**HON. JORGE ALONSO**
**United States District Judge**

US011383890B2

(12) **United States Patent**
**Finell et al.**

(10) **Patent No.: US 11,383,890 B2**
(45) **Date of Patent: Jul. 12, 2022**

(54) **SILICONE MOLDING PROCESS FOR MAKING A CONTAINER WITH ZIPPER MEMBERS TAPERED AT A FLEXIBLE SPOUT**

(71) Applicant: **ZIP TOP LLC**, Austin, TX (US)

(72) Inventors: **Rebecca Finell**, Austin, TX (US); **Joshua J. Nelson**, Mesa, AZ (US)

(73) Assignee: **ZIP TOP LLC**, Austin, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **17/360,233**

(22) Filed: **Jun. 28, 2021**

(65) **Prior Publication Data**

US 2021/0323731 A1 Oct. 21, 2021

**Related U.S. Application Data**

(63) Continuation of application No. 16/154,134, filed on Oct. 8, 2018, which is a continuation-in-part of application No. 15/910,757, filed on Mar. 2, 2018.

(Continued)

(51) **Int. Cl.**

***B29C 45/16*** (2006.01)
***B65D 33/25*** (2006.01)

(Continued)

(52) **U.S. Cl.**

CPC ......... ***B65D 33/2508*** (2013.01); ***A47G 19/02*** (2013.01); ***A47G 19/2205*** (2013.01);

(Continued)

(58) **Field of Classification Search**

CPC ......... B29C 43/18; B29C 43/20; B29C 43/02; B29C 45/14; B29C 45/16

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 1,769,186 A | 7/1930 | Morries | .......................... | 607/110 |
| 1,879,602 A | 9/1932 | Copeman | ...................... | 249/130 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| CN | 101312889 A | 11/2008 | ............. | A44B 19/16 |
| EP | 0616948 A1 | 9/1994 | ............... | B65D 1/00 |

(Continued)

OTHER PUBLICATIONS

Israeli Office Action, Application No. 281973, 5 pages, dated Oct. 21, 2021.

(Continued)

*Primary Examiner* — Edmund H Lee

(74) *Attorney, Agent, or Firm* — Slayden Grubert Beard PLLC

(57) **ABSTRACT**

A container comprising: a base and freestanding sides extending from the base to define a mouth opposite the base, wherein the mouth has first and second spouts opposite each other and first and second interior sides opposite each other between the first and second spouts; a first zipper member extending from the first interior side of the mouth from the first spout to the second spout; a second zipper member extending from the second interior side of the mouth from the first spout to the second spout, wherein the mouth is deformable between open and closed configurations and the first and second zipper members are disengageable when the mouth is open and engagable when the mouth is closed, wherein the base, sides, and zipper members are a unitary whole container without assembled parts, wherein the container comprises silicone.

**20 Claims, 18 Drawing Sheets**




**EXHIBIT B**

**Related U.S. Application Data**

(60) Provisional application No. 62/466,156, filed on Mar. 2, 2017.

(51) **Int. Cl.**

| | |
|---|---|
| ***A47G 19/02*** | (2006.01) |
| ***A47G 19/22*** | (2006.01) |
| ***B65D 33/00*** | (2006.01) |
| ***B29C 35/02*** | (2006.01) |
| ***B29C 43/00*** | (2006.01) |
| ***B29C 43/18*** | (2006.01) |
| ***B29C 45/00*** | (2006.01) |
| ***B29C 45/14*** | (2006.01) |
| ***B29C 43/02*** | (2006.01) |
| *B29K 83/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ ***B29C 35/02*** (2013.01); ***B29C 43/003*** (2013.01); ***B29C 43/02*** (2013.01); ***B29C 43/18*** (2013.01); ***B29C 45/0001*** (2013.01); ***B29C 45/14*** (2013.01); ***B29C 45/16*** (2013.01); ***B65D 33/00*** (2013.01); ***B65D 33/25*** (2013.01); ***B65D 33/2541*** (2013.01); *A47G 2400/10* (2013.01); *B29K 2083/00* (2013.01); *B29K 2083/005* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


2,012,113 A 8/1935 Thompson .................... 215/363
2,048,012 A 7/1936 Leavens .......................... 99/584
2,117,738 A 5/1938 Otto ............................ 220/266
2,144,755 A 1/1939 Freedman ................. 24/594.11
2,165,277 A 7/1939 Herman ....................... 229/405
2,542,294 A 2/1951 Smith ............................ 383/40
2,563,933 A 8/1951 Hipps et al. .................... 383/86
2,589,967 A 3/1952 Sawyer ........................ 215/372
2,595,328 A 5/1952 Bowen ......................... 607/114
2,800,269 A 7/1957 Smith ............................ 383/38
2,861,716 A 11/1958 Kramer ........................ 215/228
2,961,850 A 11/1960 Tupper ......................... 249/126
2,966,041 A 12/1960 Zearfoss, Jr. et al. ............ 62/60
3,052,399 A 9/1962 Brown .......................... 383/204
3,306,567 A 2/1967 Frei, Sr. ...................... 249/53 R
3,354,601 A * 11/1967 Schneider ......... B29C 66/83221 53/456
3,799,914 A 3/1974 Schmit et al. .................. 426/85
3,804,077 A 4/1974 Williams .................. 126/263.1
3,844,525 A 10/1974 Parmett ........................ 249/127
3,885,403 A 5/1975 Spencer .......................... 62/530
3,893,834 A 7/1975 Armstrong ......................... 62/4
4,055,188 A 10/1977 Pelton .......................... 607/112
4,527,566 A 7/1985 Abare .......................... 607/112
4,530,220 A 7/1985 Nambu et al. ................. 62/530
4,587,810 A 5/1986 Fletcher ......................... 62/3.63
D285,515 S 9/1986 Papciak ....................... D24/119
4,655,862 A * 4/1987 Christoff ................. B29C 65/20 156/244.11
4,676,247 A 6/1987 Van Cleve .................... 607/112
D291,659 S 9/1987 Powell .......................... D7/507
4,783,042 A 11/1988 Folkmar ....................... 249/127
4,813,646 A 3/1989 Fujio .............................. 249/55
4,883,251 A 11/1989 Manas ....................... 249/53 R
5,046,860 A 9/1991 Brennan ......................... 383/38
5,148,804 A 9/1992 Hill et al. ..................... 607/108
5,215,080 A 6/1993 Thomas et al. ............... 607/112
5,237,838 A 8/1993 Merritt-munson ........... 62/457.2
5,350,045 A 9/1994 Robertson ..................... 190/110
5,499,763 A 3/1996 Demars ........................ 229/114
D374,204 S 10/1996 Weder .......................... D11/143
5,689,866 A 11/1997 Kasai ............................. 24/400
5,692,837 A 12/1997 Beer ......................... 373/210.1
5,758,473 A 6/1998 Patelli ............................ 53/412
5,782,562 A 7/1998 Anspacher ...................... 383/15
D399,708 S 10/1998 Grissom ...................... D07/629
D401,141 S 11/1998 Carroll et al. ............... D09/608
D407,970 S 4/1999 Planchard ...................... D9/703
5,906,438 A 5/1999 Laudenberg ................... 383/63
D418,368 S 1/2000 Solland ......................... D7/510
D418,747 S 1/2000 Sagel ............................ D9/707
D419,867 S 2/2000 Hager et al. ................. D09/608
6,050,432 A 4/2000 Koehnke ...................... 215/11.3
D423,877 S 5/2000 Kerr ............................ D07/509
6,076,967 A 6/2000 Beaudette ....................... 383/41
6,164,488 A 12/2000 Solland ........................ 220/717
6,164,822 A 12/2000 Beer .............................. 383/38
6,164,826 A 12/2000 Petkovsek ................. 383/210.1
6,176,420 B1 1/2001 Sarson .......................... 229/128
6,197,359 B1 3/2001 Llorente Hompanera ... 426/523
6,245,367 B1 6/2001 Galomb ........................ 426/115
D445,223 S 7/2001 Butler .......................... D30/145
6,325,543 B1 12/2001 Ausnit ...................... 383/210.1
D456,211 S 4/2002 Price ............................ D7/509
D457,318 S 5/2002 Borland et al. ............. D03/303
D464,258 S 10/2002 Edwards ..................... D09/708
6,470,705 B2 10/2002 Bride-flynn ..................... 62/530
D470,361 S 2/2003 Trombly ........................ D7/509
D470,755 S 2/2003 Espinel ......................... D9/707
D482,614 S 11/2003 Countee, Jr. ................ D09/430
D495,209 S 8/2004 Tranfaglia .................... D7/509
D502,364 S 3/2005 Chan ............................ D7/509
6,945,988 B1 9/2005 Jones ........................... 607/108
7,029,178 B2 4/2006 Gzybowski ..................... 383/64
D522,183 S 5/2006 Wylie .......................... D30/118
7,065,983 B2 6/2006 Trinh et al. ..................... 62/530
7,160,029 B2 1/2007 Bein et al. ....................... 383/67
D541,171 S 4/2007 Delmotte et al. ............ D09/709
7,197,893 B2 4/2007 Trinh et al. ..................... 62/530
7,204,641 B2 4/2007 Stolmeier ....................... 383/64
D553,442 S 10/2007 Bodum ......................... D7/509
D554,432 S 11/2007 Roth et al. ................... D07/516
D567,592 S 4/2008 Fite, IV et al. .............. D07/568
D580,779 S 11/2008 Hartwell et al. ............. D09/705
D582,790 S 12/2008 Friebe ........................... D9/707
D586,232 S 2/2009 Friebe ........................... D9/707
7,524,111 B1 4/2009 Williams ................... 220/23.87
D600,072 S 9/2009 Hayes ........................... D7/509
D605,895 S 12/2009 Abbott .......................... D7/509
D609,581 S 2/2010 Doyal ......................... D09/703
D616,760 S 6/2010 Deuerer ...................... D09/611
D618,302 S 6/2010 Williams ..................... D23/209
D622,109 S 8/2010 Hull et al. ...................... D7/630
D627,608 S 11/2010 Markum ...................... D07/672
1,002,346 A1 9/2011 Weeks .......................... 229/400
8,070,359 B2 12/2011 Taheri ............................ 383/66
D657,950 S 4/2012 Herman ........................... D3/202
D660,446 S 5/2012 Baltazar ...................... D24/208
8,182,407 B2 5/2012 Yeager .......................... 493/213
8,209,995 B2 7/2012 Kieling et al. ............... 62/457.1
8,220,651 B2 7/2012 Norcom ........................ 220/1.6
D668,118 S 10/2012 Hayes et al. ................ D07/602
D672,202 S 12/2012 Craft et al. .................. D07/586
D683,190 S 5/2013 Shields ........................ D07/544
D683,592 S 6/2013 Shields ........................ D07/544
D684,867 S 6/2013 English .......................... D9/707
D684,868 S 6/2013 Kessler .......................... D9/707
D686,508 S 7/2013 Kling ............................. D9/703
8,479,972 B2 7/2013 Craft et al. ................... 229/101
D689,370 S 9/2013 Bower ........................... D9/707
8,523,440 B2 9/2013 Walker et al. ................. 383/202
D690,995 S 10/2013 Franco ........................ D07/516
8,690,428 B2 4/2014 Kruse et al. ...................... 383/5
8,696,797 B2 4/2014 Steele ............................. 95/172
D705,654 S 5/2014 Wurth et al. ................. D09/451
8,864,015 B2 10/2014 Lu ................................. 229/128
D722,805 S 2/2015 Banos .......................... D07/301
D736,099 S 8/2015 Deuerer ....................... D09/707
D739,727 S 9/2015 Olson ............................ D9/436
9,144,278 B2 9/2015 Morrow
D750,334 S 2/2016 Comstock ....................... D32/30
D755,017 S 5/2016 Piechocinski ................ D07/584
9,371,153 B1 * 6/2016 Nouri .................. B65D 75/322

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D770,916 | S | 11/2016 | Nouri et al. | D09/709 |
| D772,493 | S | 11/2016 | Wu | D30/129 |
| D772,723 | S | 11/2016 | Murray | D9/707 |
| D782,450 | S | 3/2017 | Jones | D14/240 |
| D784,157 | S | 4/2017 | Ross | D09/705 |
| D791,609 | S | 7/2017 | Rotman | D9/611 |
| 9,737,161 | B1 | 8/2017 | Li | A47G 19/22 |
| 9,751,655 | B2 | 9/2017 | Herman | |
| D804,959 | S | 12/2017 | Anda | D9/705 |
| D809,875 | S | 2/2018 | Delgado Carmona | D7/628 |
| D809,876 | S | 2/2018 | Delgado Carmona | D7/628 |
| D811,796 | S | 3/2018 | Joseph | D7/325 |
| D812,487 | S | 3/2018 | Soegyanto | D9/702 |
| D813,684 | S | 3/2018 | Williams, Jr. et al. | D9/703 |
| D815,365 | S | 4/2018 | Scariot et al. | D30/118 |
| D815,544 | S | 4/2018 | Soegyanto | D9/702 |
| D817,109 | S | 5/2018 | Kilicarslan | D7/611 |
| D826,063 | S | 8/2018 | Kwon et al. | D9/643 |
| D831,432 | S | 10/2018 | Lv | D7/606 |
| D851,853 | S | 6/2019 | Khan | D99/5 |
| D854,325 | S | 7/2019 | Myerson | D3/304 |
| D856,086 | S | 8/2019 | Goulet | D7/519 |
| D858,200 | S | 9/2019 | Wang | D7/516 |
| D860,001 | S | 9/2019 | Sahatjian | D9/707 |
| 10,407,217 | B1 * | 9/2019 | Nouri | B29C 43/18 |
| 10,421,584 | B2 | 9/2019 | Ross | |
| D874,876 | S | 2/2020 | Finell et al. | D7/602 |
| D876,172 | S | 2/2020 | Finell et al. | D7/602 |
| D876,891 | S | 3/2020 | Finell et al. | D7/509 |
| D886,533 | S | 6/2020 | Finell et al. | D7/602 |
| D886,534 | S | 6/2020 | Finell et al. | D7/602 |
| D889,205 | S | 7/2020 | Said | D7/523 |
| D904,896 | S | 12/2020 | Unterlechner | D9/703 |
| D904,897 | S | 12/2020 | Unterlechner | D9/703 |
| D905,564 | S | 12/2020 | Unterlechner | D9/703 |
| 2003/0066870 | A1 | 4/2003 | Stewart | 229/125.09 |
| 2004/0004010 | A1 | 1/2004 | Versluys | 206/219 |
| 2004/0146224 | A1 | 7/2004 | Piotrowski et al. | 383/64 |
| 2004/0211879 | A1 | 10/2004 | Stalnecker et al. | 249/121 |
| 2004/0244413 | A1 | 12/2004 | Trinh et al. | 62/530 |
| 2005/0194386 | A1 | 9/2005 | Shai | 220/287 |
| 2006/0093242 | A1 | 5/2006 | Anzini et al. | 383/63 |
| 2006/0171609 | A1 | 8/2006 | Turvey et al. | 383/63 |
| 2006/0191929 | A1 | 8/2006 | Berg et al. | 220/6 |
| 2006/0191985 | A1 | 8/2006 | Norcom | 229/117.05 |
| 2006/0193541 | A1 | 8/2006 | Norcom | 383/200 |
| 2007/0130733 | A1 | 6/2007 | Kasai | 24/585.12 |
| 2007/0164192 | A1 | 7/2007 | Holden et al. | 249/98 |
| 2007/0175787 | A1 | 8/2007 | Lown et al. | 206/427 |
| 2008/0050053 | A1 | 2/2008 | Szczesuil | 383/66 |
| 2008/0063318 | A1 | 3/2008 | Gattino | 383/21 |
| 2008/0087268 | A1 | 4/2008 | Burton | 126/9 R |
| 2008/0089618 | A1 | 4/2008 | Blythe | 383/25 |
| 2008/0277310 | A1 | 11/2008 | Chacon | 206/568 |
| 2009/0038656 | A1 * | 2/2009 | Ahrenholtz | A61L 2/26 134/135 |
| 2009/0110335 | A1 | 4/2009 | Leboeuf | 383/63 |
| 2009/0136161 | A1 | 5/2009 | Hickey | 383/66 |
| 2009/0279810 | A1 | 11/2009 | Nobles | 383/66 |
| 2010/0012531 | A1 | 1/2010 | Steele | 206/216 |
| 2010/0072224 | A1 | 3/2010 | Ha | 222/107 |
| 2010/0159083 | A1 | 6/2010 | Peplinski et al. | 426/113 |
| 2010/0159096 | A1 | 6/2010 | Sam | 426/394 |
| 2010/0300919 | A1 | 12/2010 | Alipour | 206/524.8 |
| 2010/0314434 | A1 | 12/2010 | Herman | 229/107 |
| 2011/0017812 | A1 | 1/2011 | Belko et al. | 229/117.27 |
| 2011/0017814 | A1 | 1/2011 | Belko et al. | 229/124 |
| 2011/0132910 | A1 | 6/2011 | Willat | 220/495.03 |
| 2011/0203944 | A1 | 8/2011 | Singer | 206/204 |
| 2011/0297680 | A1 | 12/2011 | Howell et al. | 220/266 |
| 2012/0060449 | A1 | 3/2012 | Howell et al. | 53/456 |
| 2012/0187182 | A1 | 7/2012 | Howell et al. | 229/102 |
| 2012/0269469 | A1 | 10/2012 | Long et al. | 383/210.1 |
| 2013/0084028 | A1 | 4/2013 | Cross | 383/33 |
| 2013/0105352 | A1 | 5/2013 | Munguia | 206/524.6 |
| 2013/0277367 | A1 | 10/2013 | Kozarsky et al. | 220/315 |
| 2014/0042217 | A1 | 2/2014 | Houck | 229/404 |
| 2014/0212075 | A1 | 7/2014 | Cross | 383/64 |
| 2014/0226921 | A1 | 8/2014 | Albers | 383/86.2 |
| 2014/0245698 | A1 | 9/2014 | Steele | 53/410 |
| 2014/0270579 | A1 * | 9/2014 | Nouri | B65D 33/2541 383/25 |
| 2015/0202832 | A1 | 7/2015 | Denis et al. | 383/63 |
| 2015/0203250 | A1 | 7/2015 | Denis | 383/63 |
| 2016/0137374 | A1 | 5/2016 | Brosch et al. | 383/104 |
| 2016/0145030 | A1 | 5/2016 | Malligan et al. | 426/120 |
| 2017/0036822 | A1 | 2/2017 | Sam | 383/38 |
| 2018/0148228 | A1 | 5/2018 | Bray | |
| 2018/0251267 | A1 * | 9/2018 | Finell | A47G 19/2205 |
| 2018/0370109 | A1 | 12/2018 | Shaw | |
| 2019/0270546 | A1 | 9/2019 | Finell | |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| JP | D140735 | S | 11/2010 | |
| JP | D1454613 | S | 11/2012 | |
| JP | 1481231 | S | 10/2013 | |
| JP | 1611864 | S | 8/2018 | |
| JP | D1625224 | S | 2/2019 | |
| JP | D1630549 | S | 5/2019 | |
| JP | D1630736 | S | 5/2019 | |
| JP | 1655101 | S | 3/2020 | |
| JP | 1661295 | S | 6/2020 | |
| TW | M515388 | | 1/2016 | A61J 1/05 |
| WO | 98/12488 | A1 | 3/1998 | B65D 33/25 |
| WO | 2016/140746 | A1 | 9/2016 | G01F 19/00 |

OTHER PUBLICATIONS

U.S. Non-Final Office Action, U.S. Appl. No. 15/910,757, 22 pages, dated Dec. 2, 2021.

CN 101312889 A, US 2006/0093242 A1.

JP D1625224 S, US D876891 S.

JP D1630549 S, US D886533 S.

JP D1630736 S, US D886534 S.

Partial European Search Report, Application No. 18159842.6, 9 pages, dated Jun. 29, 2018.

Chinese Office Action, Application No. 201830098713.5, 1 page, dated Jul. 5, 2018.

Chinese Office Action, Application No. 201830099279.2, 1 page, dated Jul. 9, 2018.

Chinese Office Action, Application No. 201830098714.X, 1 pages, dated Jul. 11, 2018.

Chinese Office Action, Application No. 201830099010.4, 1 page, dated Jul. 11, 2018.

Taiwan Office Action, Application No. 107301545, 6 pages, dated Sep. 12, 2018.

Taiwan Office Action, Application No. 107301546, 5 pages, dated Sep. 12, 2018.

U.S. Non-Final Office Action, U.S. Appl. No. 15/910,757, 21 pages, dated Oct. 2, 2018.

Extended European Search Report and Written Opinion, Application No. 18159842.6, 9 pages, dated Oct. 19, 2018.

Taiwan Office Action, Taiwan Design Application No. 107301543, 4 pages, dated Dec. 18, 2018.

U.S. Final Office Action, U.S. Appl. No. 15/910,757, 17 pages, dated Feb. 21, 2019.

U.S. Non-Final Office Action, U.S. Appl. No. 15/910,757, 18 pages, dated Jun. 14, 2019.

U.S. Final Office Action, U.S. Appl. No. 15/910,757, 22 pages, dated Sep. 18, 2019.

U.S. Non-Final Office Action, U.S. Appl. No. 16/154,134, 39 pages, dated Oct. 1, 2019.

U.S. Non-Final Office Action, U.S. Appl. No. 29/699,634, 14 pages, dated Oct. 21, 2019.

U.S. Non-Final Office Action, U.S. Appl. No. 29/699,650, 14 pages, dated Oct. 21, 2019.

U.S. Non-Final Office Action, U.S. Appl. No. 29/699,656, 14 pages, dated Oct. 21, 2019.

(56) **References Cited**

OTHER PUBLICATIONS


U.S. Advisory Action, U.S. Appl. No. 15/910,757, 3 pages, dated Oct. 28, 2019.
U.S. Notice of Allowance, U.S. Appl. No. 29/699,611, 16 pages, dated Oct. 30, 2019.
U.S. Non-Final Office Action, U.S. Appl. No. 29/618,115, 27 pages, dated Nov. 27, 2019.
U.S. Non-Final Office Action, U.S. Appl. No. 29/618,138, 27 pages, dated Nov. 29, 2019.
U.S. Non-Final Office Action, U.S. Appl. No. 29/618,099, 27 pages, dated Nov. 29, 2019.
U.S. Notice of Allowance, U.S. Appl. No. 29/699,278, 19 pages, dated Dec. 4, 2019.
U.S. Notice of Allowance, U.S. Appl. No. 29/699,301, 19 pages, dated Dec. 4, 2019.
U.S. Notice of Allowance, U.S. Appl. No. 29/699,897, 18 pages, dated Dec. 4, 2019.
U.S. Notice of Allowance, U.S. Appl. No. 29/699,904, 19 pages, dated Dec. 4, 2019.
U.S. Non-Final Office Action, U.S. Appl. No. 15/910,757, 21 pages, dated Jan. 8, 2020.
International Search Report and Written Opinion, Application No. PCT/US2019/054935, 11 pages, dated Feb. 4, 2020.
Taiwan Office Action, Application No. 107301546, 30 pages, dated Feb. 10, 2020.
Taiwan Office Action, Application No. 107301545, 20 pages, dated Feb. 10, 2020.
U.S. Non-Final Office Action, U.S. Appl. No. 16/296,416, 43 pages, dated Mar. 13, 2020.
International Search Report and Written Opinion, Application No. PCT/US2020/017893, 12 pages, dated May 20, 2020.
U.S. Advisory Action, U.S. Appl. No. 16/154,134, 4 pages, dated Jun. 12, 2020.
Japanese Office Action, Application No. 2020001090, 9 pages, dated Jun. 15, 2020.
Japanese Office Action, Application No. 2020001093, 9 pages, dated Jun. 15, 2020.
Japanese Office Action, Application No. 2020001101, 8 pages, dated Jun. 15, 2020.
Japanese Office Action, Application No. 2020001087, 8 pages, dated Jun. 15, 2020.
Japanese Office Action, Application No. 2020001088, 8 pages, dated Jun. 15, 2020.
Japanese Office Action, Application No. 2020001089, 9 pages, dated Jun. 15, 2020.
U.S. Final Office Action, U.S. Appl. No. 15/910,757, 28 pages, dated Jul. 8, 2020.
U.S. Final Office Action, U.S. Appl. No. 16/296,416, 19 pages, dated Jul. 16, 2020.
U.S. Non-Final Office Action, U.S. Appl. No. 16/154,134, 29 pages, dated Sep. 24, 2020.
U.S. Advisory Action, U.S. Appl. No. 15/910,757, 6 pages, dated Oct. 15, 2020.
U.S. Non-Final Office Action, U.S. Appl. No. 16/296,416, 24 pages, dated Feb. 23, 2021.
Chinese Office Action, Application No. 201810176215.7, 6 pages, dated May 27, 2021.
Japanese Office Action, U.S. Appl. No. 20/201,088, 6 pages, dated Jun. 1, 2021.
Japanese Office Action, U.S. Appl. No. 20/201,089, 6 pages, dated Jun. 1, 2021.
Japanese Office Action, U.S. Appl. No. 20/201,090, 6 pages, dated Jun. 1, 2021.
Japanese Office Action, U.S. Appl. No. 20/201,093, 6 pages, dated Jun. 1, 2021.
Japanese Office Action, U.S. Appl. No. 20/201,087, 6 pages, dated Jun. 1, 2021.
U.S. Non-Final Office Action, U.S. Appl. No. 29/699,320, 38 pages, dated Jun. 30, 2021.
U.S. Non-Final Office Action, U.S. Appl. No. 29/699,437, 38 pages, dated Jun. 30, 2021.
U.S. Non-Final Office Action, U.S. Appl. No. 29/699,459, 38 pages, dated Jun. 30, 2021.
Chinese Office Action, Application No. 201810176215.7, 11 pages, dated Jan. 29, 2022.
U.S. Non-Final Office Action, U.S. Appl. No. 17/355,996, 43 pages, dated Apr. 29, 2022.


* cited by examiner




FIG. 1A




FIG. 1B




FIG. 1C

FIG. 1D




FIG. 1E






FIG. 1F




FIG. 1G




FIG. 1H

FIG. 1I




FIG. 1J






FIG. 2A

FIG. 2B





FIG. 2C




FIG. 2D




FIG. 2E




FIG. 2F




FIG. 2G




FIG. 2H




FIG. 2I




FIG. 2J




FIG. 3A




FIG. 3B




FIG. 4A




FIG. 4B




FIG. 5A




FIG. 5B




FIG. 5C




FIG. 6A




FIG. 6B




SECTION C-C

FIG. 6C



SECTION D-D

FIG. 6D



SECTION E-E

FIG. 6E




FIG. 6F




SECTION G-G

FIG. 6G




FIG. 7A




FIG. 7B




SECTION C-C

FIG. 7C




SECTION D-D

FIG. 7D

# SILICONE MOLDING PROCESS FOR MAKING A CONTAINER WITH ZIPPER MEMBERS TAPERED AT A FLEXIBLE SPOUT

## CONTINUATION STATEMENT

This application is a continuation of U.S. application Ser. No. 16/154,134 filed Oct. 8, 2018, which is a continuation-in-part of U.S. application Ser. No. 15/910,757 filed Mar. 2, 2018, which claims the benefit of U.S. Provisional Application No. 62/466,156 filed Mar. 2, 2017, which is incorporated herein in its entirety.

## TECHNICAL FIELD

The present disclosure relates generally to the field of sealable cups, bowls and tumblers made of silicone.

## BACKGROUND

U.S. Pat. No. 6,197,359, incorporated herein by reference, describes the use of silicone for manufacturing of confectionery molds and baking receptacles, wherein silicone may be used for applications in contact with foodstuffs, in particular, methyl-vinyl-polysiloxane obtained by a process of cross-linking with platinum. Silicone is a material of polymeric nature whose chains are made up of alternating oxygen and silicon atoms. Silicones are normally prepared by hydrolysis and subsequent polymerisation of alkylhalogensilanes (both acid- and base-catalysed). The alkylhalogensilanes are in practice made by a direct process, Cu-catalysed, in which the Si reacts with the corresponding alkyl halide. This process provides mixtures of products, whose composition can be modified by a process of redistribution to yield the desired monomer. Known in the art are silicone elastomers, which are made up of linear polymers. A cross-linking, phase is required in order to provide the elastic properties. The most common elastomers are those deriving from dichloromethylsilane, with molecular weights ranging between 300,000 and 700,000. They are made by a prepolymerisation that provides octamethylcyclotetrasiloxane, purification thereof and subsequent polymerisation in the presence of a small quantity of monofunctional material in order to control the molecular weight, followed by a cross-linking similar to curing, in the presence of peroxides, which lends the material its elastic properties. Other important elastomers are those that contain a small proportion (0.1% molar) of vinyl groups linked to silicon, which undergo much more effective curing, and those that contain between 10 and 15% molar of phenyl groups, and good elastic properties at low temperatures. Elastomers of a much lower molecular weight (10.000 to 100,000) can be obtained by using linear polymer chains ending in silanol groups, which can be cured at room temperature by reaction with an alkoxylene. In general, the most important characteristic of the silicone elastomers is the fact that they present a very broad thermal spectrum of use (from −50° C. to 200° C.) without a significant alteration of their properties. They have good electrical insulation properties, do not self-oxidise or undergo attack by chemical agents in aqueous medium and swell in the presence of non-polar organic solvents, although some special types that contain fluoro- or cyano-groups offer greater resistance to this process. Silicone elastomers find their widest industrial application as electrical insulators, fluid-repellents and oxidation protectors, and in the manufacturing of hermetic gaskets. The



silicones are highly inert materials, and they repel water. Silicone is inert to chemical agents, with the exception of strong bases and acids, and its toxicity is generally low. The origin of these properties lies essentially in the high stability of the Si—O bond (106 Kcal/mol), and in its strong partial ionic character. Other known uses of silicones are in the manufacturing of containers for liquids (such as wineskins) and tubes for transporting substances (such as the tubes used for blood transfusions).

U.S. Publication 2014/0270579, incorporated herein by reference, discloses a silicone bag. In particular, the publication teaches a bag having a front and back portion which are comprised of silicone or a similar elastomer. The front and back portion are identical in size and are sealed together along their sides and bottom with a mouth along the top portion. The mouth creates a cavity from Which items are placed in and stored or transported for further use. A sealing mechanism (ribs pressed into slots) on top of the bag seals items in the bag. The bag is molded entirely of silicone, including the sealing mechanism, to be water tight.

U.S. Publication 2014/0245698, incorporated herein by reference, discloses a package having a foldable top region. The package generally includes panel portions that at least partially define an interior cavity there between and accessible through an access mouth. The top portion can provide a cuff member or cuff region that can be folded and unfolded to facilitate use of the package as a bowl or other cuffed container for material contents. The package can be adapted to hold its shape as a bowl or cuffed container. A reclosure member can be provided to facilitate re-sealing of the package. A folding strip, edge contours and stiffening members can also be provided.

U.S. Publication 2009/0110335, incorporated herein by reference, discloses a reclosable food storage bag able to withstand a wide temperature range manufactured from environmentally sensitive materials is disclosed. The bag can be manufactured from such materials as silicone rubber and thermoset resins. By using such materials, the bag can easily withstand the temperature ranges encountered in residential kitchens extending from the freezer to the oven and all ambient temperatures there between. In addition, by manufacturing the bag from such materials, the environmental impact of using petroleum based polymers is avoided.

U.S. Pat. No. 9,371,153, incorporated herein by reference, discloses a container made of an elastomer such as silicone with an integrated leak resistant seal having press-fit elements. The sizes and shapes of the press-fit elements seal the mouth to resist leakage of liquids from inside the container. No external clips or clasps are needed for the seal. Extended flaps facilitate pulling the sides open. The container itself may be of asymmetrical shape, e.g. trapezoidal.

## SUMMARY

In accordance with the teachings of the present disclosure, containers such as cups, bowls and tumblers made of silicone are provided that have spouts and zipper members for sealing the mouth of the container.

An aspect of the invention provides a container comprising: a base and freestanding sides extending from the base to define a mouth opposite the base, wherein the mouth has first and second spouts opposite each other and first and second interior sides opposite each other between the first and second spouts; a first zipper member extending from the first interior side of the mouth from the first spout to the second spout; a second zipper member extending from the second interior side of the mouth from the first spout to the

second spout, wherein the mouth is deformable between open and closed configurations and the first and second zipper members are disengageable when the mouth is open and engagable when the mouth is closed, wherein the base, sides, and zipper members are a unitary whole container without assembled parts, wherein the container comprises silicone.

A further aspect of the invention provides a container made by a molding process, wherein the container comprises: a base and freestanding sides extending from the base to define a mouth opposite the base, wherein the mouth has first and second spouts opposite each other and first and second interior sides opposite each other between the first and second spouts; a first zipper member extending from the first interior side of the mouth from the first spout to the second spout; a second zipper member extending from the second interior side of the mouth from the first spout to the second spout, wherein the mouth is deformable between open and closed configurations and the first and second zipper members are disengageable when the mouth is open and engagable when the mouth is closed, wherein the base, sides, and zipper members are a unitary whole container without assembled parts, wherein the container comprises silicone, wherein the molding process comprises a silicone molding process selected from liquid injection molding, compression molding, and transfer molding.

## BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the present embodiments may be acquired by referring to the following description taken in conjunction with the accompanying drawings, in which like reference numbers indicate like features.

FIGS. **1**A and **1**B illustrate perspective views of a short container in an open configuration.

FIGS. **1**C, **1**D and **1**E show end, side and bottom views, respectively, of the short container of FIGS. **1**A and **1**B.

FIGS. **1**F and **1**G illustrate perspective views of a short container in a closed configuration.

FIGS. **1**H, **1**I and **1**J show end, side and bottom views, respectively, of the short container of FIGS. **1**F and **1**G.

FIGS. **2**A and **2**B illustrate perspective views of a tumbler in an open configuration.

FIGS. **2**C, **2**D and **2**E show end, side and bottom views, respectively, of the tumbler of FIGS. **2**A and **2**B.

FIGS. **2**F and **2**G illustrate perspective views of a tumbler in a closed configuration.

FIGS. **2**H, **2**I and **2**J show end, side and bottom views, respectively, of the tumbler of FIGS. **2**F and **2**G.

FIGS. **3**A and **3**B illustrate perspective views of a bowl in open and closed configurations, respectively.

FIGS. **4**A and **4**B illustrate perspective views of a tall container in open and closed configurations, respectively.

FIG. **5**A illustrates a perspective view of a tumbler in an open configuration.

FIG. **5**B shows a top view of the tumbler of FIG. **5**A, wherein the zipper members cross over and remain engaged at the spouts.

FIG. **5**C shows a top view of the tumbler of FIG. **5**A, wherein the zipper members cross over and remain engaged at the spouts.

FIG. **6**A is a perspective view of a tumbler having a spout at each end of the mouth.

FIG. **6**B shows a top view of the tumbler of FIG. **6**A with cross-sections indicated.

FIGS. **6**C, **6**D and **6**E are cross-sectional end views of the indicated cross-sections of FIG. **6**B.

FIG. **6**F shows a top view of the tumbler of FIG. **6**A with a cross-section indicated.

FIG. **6**G is a cross-sectional front view of the tumbler of FIG. **6**A showing how the zipper member terminates at the spouts.

FIG. **7**A is a perspective view of a tumbler having a spout at each end of the mouth and an alternative embodiment of the zipper members.

FIG. **7**B shows a top view of the tumbler of FIG. **6**A with cross-sections indicated.

FIGS. **7**C and **7**D are cross-sectional end views of the indicated cross-sections of FIG. **7**B.

## DETAILED DESCRIPTION

Preferred embodiments are best understood by reference to FIGS. **1-8** below in view of the following general discussion. The present disclosure may be more easily understood in the context of a high level description of certain embodiments.

Embodiments of the present invention provide a cup or a bowl that stands on its own and zips at the top like a re-sealable zipper storage bag. The cup or bowl may be made with silicone in one piece, be flexible, be food grade, and be dishwasher/microwave safe. The cup or bowl may be used as a dish/cup. The cup or bowl may be used as a storage container. In particular, the cup or bowl may be great for travel.

The material may be thicker at the base for stability. The top may be thinner and more flexible. The zipper may be a tongue and groove configuration wherein a male portion is mated with a female portion to make the seal. The zipper may be a dual zipper or triple zipper. A clasp may be assembled to the exterior of the zipper for sliding along the zipper to assist with the mouth and/or closing of the zipper. The zipper may comprises male and female members that engage to seal the mouth. For purposes of this disclosure the mouth is considered sealed by the zipper members when the zipper members engage sufficiently to remain closed independent of any outside influences and retain water inside an up-side-down container. Containers may hold between 1 and 20 cups of water volume.

The container with zipper members may be molded as one unitary whole, in particular, without assembled parts. For example, to make a container that is a unitary whole without assembled parts, the entirety of the container with all its parts including zipper members may be compression molded, liquid injection molded, transfer molded or molded by any similar process. Overmolding may be included in these molding processes, wherein the zipper members may first be separately molded and then placed inside the container mold so that when the container is molded, the zipper members become "overmolded" or "encapsulated" by the liquid silicone being injected in the mold to form the container, and thereby become a unitary whole with the container. The zipper members and container may be made to become a unitary whole by separately forming or molding and then placing them in contact when the silicone material when it is not fully crosslinked (cured), and then postbaking the parts to vulcanize the whole thing. The zipper members or other portions of the container may be made from a harder durometer or different material injected into the mold, so that it may be a dual-durometer or co-molded product.

Silicone, in particular, titanium silicone may be used. A silicone having a durometer of between 30-80 shore A, for example, may be used. The silicone may have an elongation

a break between 290% and 620%. The silicone may have a tear strength of 21-33 N/mm.

One aspect of the invention is to use a liquid silicone rubber injection mold process to make the container as a single unitary product. Uncured liquid silicone rubber may start as two materials: a base-forming material and a catalyst. The materials may be released into a mixing chamber, wherein color pigmentations or other additives may also be released into the mixing chamber. A specific volume may be injected into the mold as an appropriate shot size for each job. Temperature, pressure, injection rate and cycle time may be adjusted depending on the size and shape of the container being molded. The mold may comprise two or more plates. Liquid silicone rubber may be injected into a preheated mold to push the material into the mold and cavities therein. The liquid silicone rubber is cured in the mold by the application of heat and pressure until it solidifies. A rate of silicone shrinkage should be considered. Because silicone is an elastic material, flashing may occur when removed from the cavity of a mold. Flashing can be removed from the molded container automatically or manually.

Another aspect of the invention is to use a high consistency silicone rubber compression mold process to make the container as a single unitary product. Granular bulk silicone material is pre-catalyzed by adding powder. An exact amount of silicone required to make the container is determined. A determined amount of silicone is cut and weighed and strategically placed in a mold cavity. The silicone material may be pre-shaped to the approximate configuration of the container so that it fills all portions of the interior of the mold. The mold is heated to 300 degrees Celsius or higher as force is applied by compressing the silicone between the plates of the mold to flow the silicon into the cavities of the mold. The silicone is cured or vulcanized by an irreversible chemical reaction under heat and pressure to make a highly cross-linked molecular structure. The mold is opened and the molded container is removed. Flashing can be removed from the molded container automatically or manually.

According to certain embodiments of the invention, one feature is to have a free standing container with a zipper seal of the mouth at the top, wherein the mouth remains open when unsealed. A benefit to users is that the mouth of the contain remains open in a free standing position, so users may pour or spoon contents into or out of the container without having to hold open the mouth of the container. To enable this feature, the container may be silicone molded in in an open position, so that the finished container naturally wants to assume an open position. The zipper members may be silicone molded in straight molds so that by themselves they naturally tend to assume straight positions. When the zipper members are then joined in the zipper slots of the container, the combination tends to cause the mouth of the container to naturally assume an open eye-shape when free-standing.

The figures show perspective, side and end views of separate cups, bowls or containers. Each cup, bowl or container is made of a flexible material that is sufficiently rigid in the base regions to stand on their own, but sufficiently flexible in the closure region to allow the mouths to transition between open and closed configurations.

FIGS. **1**A-1J show perspective, side and end views of a short container. The short container **10** comprises a base **11** that is generally oval in shape. The short container **10** further comprises a mouth **12** at the top, wherein the mouth is generally circular when open and general linear when closed. The base **11** comprises a wall thickness and material composition that has sufficient stiffness or rigidity to resist deformation in response to applied forces. The mouth **12** comprises wall thicknesses and material compositions that are sufficiently flexible or pliable to allow the mouth **12** to be deformed between open and closed configurations. In one embodiment, the short container **10** may have wall thicknesses or rigidity that vary uniformly from the base **11** to the mouth **12**, wherein the wall thicknesses are thicker or more rigid at the base **11** and thinner or less rigid at the mouth **12**. The short container **10** may have a zipper slot **13** near the mouth **12** to seal the mouth in a closed configuration.



FIG. **1**A is a perspective view of the short container **10** in an open configuration wherein the view is looking down through the mouth into the interior of the short container **10**. FIG. **1**B is a perspective view of the short container **10** in an open configuration wherein the view is looking up toward the base **11**. FIG. **1**C is an end view of the short container **10** in an open configuration, wherein the view from each end is identical. FIG. **1**D is a side view of the short container **10** in an open configuration, wherein the views from both the front and back are identical. FIG. **1**E is a bottom view of the short container **10** in an open configuration.

FIG. **1**F is a perspective view of the short container **10** in a closed configuration wherein the view is looking down at the closed mouth **12** of the short container **10**. FIG. **1**G is a perspective view of the short container **10** in a closed configuration wherein the view is looking up toward the base **11**. FIG. **1**H is an end view of the short container **10** in a closed configuration, wherein the view from each end is identical. FIG. **1**I is a side view of the short container **10** in a closed configuration, wherein the views from both the front and back are identical. FIG. **1**J is a bottom view of the short container **10** in a closed configuration.

In alternative embodiments, the base **11** of the short container **10** may be any geometric shape, for example, square, rectangle, triangle, octagon, hexagon, oval, etc. Further, the mouth **12** may also be of any geometric shape. Still further, cross-sections of the short container **10** between the base **11** and the mouth **12** may be of any geometric shape. In some embodiments of the invention, the base **11**, mouth **12**, and cross-sections between the base **11** and mouth **12** all have the same geometric shape. In still other embodiments of the invention, the base **11**, mouth **12**, and cross-sections between the base **11** and mouth **12** have different geometric shapes.

FIGS. **2**A-2J show perspective, side and end views of a tumbler. The tumbler **20** comprises a base **21** that is generally circular in shape. The tumbler **20** further comprises a mouth **22** at the top, wherein the mouth is generally circular when open and general linear when closed. The base **21** comprises a wall thickness and material composition that has sufficient stiffness or rigidity to resist deformation in response to applied forces. The mouth **22** comprises wall thicknesses and material compositions that are sufficiently flexible or pliable to allow the mouth **22** to be deformed between open and closed configurations. The tumbler **20** may have a zipper slot **23** near the mouth **22** to seal the mouth in a closed configuration. The tumbler **20** may have wall thicknesses and rigidity that vary uniformly from the base **21** to the mouth **22**, wherein the wall thicknesses are thicker or more rigid at the base **21** and thinner or less rigid at the mouth **22**.

FIG. **2**A is a perspective view of the tumbler **20** in an open configuration wherein the view is looking down through the mouth into the interior of the bowl **20**. FIG. **2**B is a perspective view of the tumbler **20** in an open configuration

wherein the view is looking up toward the base **21**. FIG. **2C** is an end view of the tumbler **20** in an open configuration, wherein the view from each end is identical. FIG. **2D** is a side view of the tumbler **20** in an open configuration, wherein the views from both the front and back are identical. FIG. **2E** is a bottom view of the tumbler **20** in an open configuration.

FIG. **2F** is a perspective view of the tumbler **20** in a closed configuration wherein the view is looking down at the closed mouth **22** of the tumbler **20**. FIG. **2G** is a perspective view of the tumbler **20** in a closed configuration wherein the view is looking up toward the base **21**. FIG. **2H** is an end view of the tumbler **20** in a closed configuration, wherein the view from each end is identical. FIG. **2I** is a side view of the tumbler **20** in a closed configuration, wherein the views from both the front and back are identical. FIG. **2J** is a bottom view of the tumbler **20** in a closed configuration.

In alternative embodiments, the base **21** of the tumbler **20** may be any geometric shape, for example, square, rectangle, triangle, octagon, hexagon, oval, etc. Further, the mouth **22** may also be of any geometric shape. Still further, cross-sections of the tumbler **20** between the base **21** and the mouth **22** may be of any geometric shape. In some embodiments of the invention, the base **21**, mouth **22**, and cross-sections between the base **21** and mouth **22** all have the same geometric shape. In still other embodiments of the invention, the base **21**, mouth **22**, and cross-sections between the base **21** and mouth **22** have different geometric shapes.

FIG. **3A** is a perspective view of the bowl **30** in an open configuration wherein the view is looking down through the mouth **32** into the interior of the bowl **30**. A zipper slot **33** is just inside the mouth **32**. The bowl **30** stands vertically upright on a base **31**. FIG. **3B** is a perspective view of the bowl **30** in a closed configuration wherein the view is looking down at the closed mouth **32** of the bowl **30**.

FIG. **4A** is a perspective view of a tall container **40** in an open configuration wherein the view is looking down through the mouth **42** into the interior of the tall container **40**. The tall container **40** stands vertically on its base **41** with the mouth **42** at the top. A zipper slot **43** is just inside the mouth **42**. FIG. **4B** is a perspective view of the tall container **40** in a closed configuration wherein the view is looking down at the closed mouth **42** of the tall container **40**.

FIG. **5** shows a perspective view of a tumbler **50**. The tumbler **50** comprises a base **51** that is circular in shape. The tumbler **50** further comprises a mouth **52** at the top, wherein the mouth **52** is generally circular when open and generally linear when closed. The tumbler **50** further comprises a rim **54** between the base **51** and the mouth **52**. The tumbler **50** comprises a lower wall **55** between the base **51** and the rim **54** having a thickness and material composition that has sufficient stiffness or rigidity to resist deformation in response to applied forces, so that the tumbler **50** may freely stand vertically on its base **51**. Further, the tumbler **50** has an upper wall **56** between the base **51** and the rim **54** having a wall thickness and material composition sufficiently flexible or pliable to allow the mouth **52** to be deformed between open and closed configurations. In one embodiment, the circumference of the upper wall **56** above the rim **54** may be larger than the circumference of the lower wall **55** below the rim **54**, so that the upper wall **56** may be rolled or folded down over the exterior of the lower wall **55** below the rim **54**. In a rolled or folded down configuration, the bowl **50** may more fully function as a traditional bowl. To seal the tumbler **50**, the upper wall **56** may be unrolled or unfolded to an extended position, as shown in FIG. **5**, and a zipper in



the zipper slot **53** may be zipped to form a seal. Embodiments of a container, cup or bowl may be similar to the tumbler **50** shown in FIG. **5**.

Some embodiments of the invention, made of silicone, have base and sidewall thicknesses greater than 0.5 mm. Other embodiments of the invention, made of silicone, have base and sidewall thicknesses between about 0.7 mm and about 1.3 mm. Still further embodiments of the invention, made of silicone, have base and sidewall thicknesses of about 1.0 mm.

The tumblers, cups or bowls may be made of silicone material that is either transparent or opaque and made to be any color. The silicone may be of a quality and composition appropriate for applications in contact with foodstuffs. In particular, methyl-vinyl-polysiloxane obtained by a process of cross-linking with platinum may be an appropriate silicone. Material may include polyurethane rubber, tin-cured silicone rubber, and platinum-cured silicone rubber. Numeric markers may be added to indicate volumetric measurements within the cups, bowls or tumblers.

FIG. **5B** is a cross-sectional top view of the tumbler shown in FIG. **5A**, wherein male and female zipper members **57** and **58** are shown. The male zipper member **57** is positioned just inside the mouth **52** and extends from one interior side of the tumbler **50**. The female zipper member **58** is positioned just inside the mouth **52** and extends from the other side of the tumbler **50**. In this embodiment, the tumbler **50** has relatively thick tips **59** at opposite ends of the mouth **52**, wherein each tip **59** form an interior wall transverse to the axis of the mouth **52**. The exterior surfaces of tips **59** provide “handles” for a user to hold the tumbler **50** while closing the zipper members **57** and **58** together. The zipper members terminate at the interior walls of the tips **59** to completely seal the mouth **52** of the tumbler **50** when closed. The zipper members **57** and **58** “cross over” each other at the tips **59** so that the male and female zipper elements completely engage at the tips **59**, even when the mouth **52** of the tumbler **50** is open as shown in FIG. **5B**. To close the mouth **52**, a user simply squeezes the sides of the mouth **52** together and pinches the zipper members **57** and **58** together until the male and female zipper members **57** and **58** are completely engaged from tip **59** to tip **59**. When open, the mouth **52** forms a spout **53** at each tip **59**

FIG. **5C** is a cross-sectional top view of an alternative tumbler **50** shown in FIG. **5A**, wherein male and female zipper members **57** and **58** are shown. Similar to the embodiment shown in FIG. **5B**, the male zipper member **57** is positioned just inside the mouth **52** and extends from one interior side of the tumbler **50** and the female zipper member **58** is positioned just inside the mouth **52** and extends from the other side of the tumbler **50**. However, in this embodiment, the tips **59**, formed at each end of the mouth **52**, have relatively thin wall thicknesses and each tip **59** does not form an interior wall transverse to the axis of the mouth **52**. The wall thicknesses in the region of the tip **59** is approximately the same as the side walls forming the mouth **52**. The male and female zipper members **57** and **58** extend all the way to the most extreme ends of the tips **59** and “cross over” each other at the tips **59**. The ends of the zipper members **57** and **58** are angled at about 45 degrees, so that when the zipper members **57** and **58** are closed together, they seal the zipper at the tips **59**.

FIGS. **6A-6E** show perspective, top and cross-sectional end views of a tumbler **60**. The tumbler **60** comprises a base **61** that is generally circular in shape. The tumbler **60** further comprises a mouth **62** at the top, wherein the mouth is generally circular when open and generally linear when

closed. At each end of the interior of the mouth **62**, the tumbler **60** has a spout **63**. In this embodiment, the tips **69**, formed at each end of the mouth **62**, have wall thicknesses approximately the same as the side walls forming the mouth **62**. The male zipper member **67** is positioned just inside the mouth **62** and protrudes from one interior side of the tumbler **60** and extends from one spout **63** to the other spout **63**. The female zipper member **68** is positioned just inside the mouth **62** and protrudes from the other interior side of the tumbler **60** and extends from one spout **63** to the other spout **63**.

FIG. **6**A is a perspective view of the tumbler **60**. FIG. **6**B is a top view of the tumbler **60** with indicated cross-sections, wherein sections C-C, D-D and E-E are shown in FIGS. **6**C-**6**E, respectively. Throughout a substantial portion of the middle of the male and female members **67** and **68**, the members are fully formed and fully dimensioned. FIG. **6**C shows the fully formed and fully dimensioned male and female members **67** and **68**. In this embodiment, the members have interlocking features that hold them together and form a seal when the male zipper member **67** is inserted into the female zipper member **68**. In cross-section, the male zipper member **67** has a button or mushroom profile having a trunk **101** with a head **102** at the distal end of the trunk **101**. The head **102** is wider than the trunk **101** so that two shoulders **103** extend in opposite directions from the trunk **101**. In cross-section, the female zipper member **68** comprises two opposed flanges **104**, wherein each flange **104** has a shoulder **105** extending toward the opposite flange **104**. When the male and female members **67** and **68** are engaged to close and seal the mouth **62**, the head **102** is inserted between the flanges **104** until the shoulders **103** of the male zipper member **67** become locked behind shoulders **105** of the female zipper member **68**. Because the male and female members **67** and **68** are made of a flexible material, the members flex during insertion and rebound upon engagement.

As the male and female members **67** and **68** extend toward the spouts **63**, they become shorter in height but retain their form. FIG. **6**D shows the relatively shorter male and female members **67** and **68**. In particular, the size of the head **102** of the male zipper member **67** is the same size and the channel defined by the flanges **104** of the female zipper member **68** is the same size as the head and channel shown in FIG. **6**C.

As the male and female members **67** and **68** extend nearly to the spouts **63**, they become even shorter in height and change their form. In this embodiment, the members change their form by reducing the size of the head **102** and reducing the size of the channel between the flanges **104**. FIG. **6**E shows the relatively shorter male and female members **67** and **68**. The shoulders **103** and **105** also shrink in size as the member tapers toward the spouts **63**. The male and female members **67** and **68** continue to taper until they become non-existent at the spouts **63**.

FIG. **6**F is a bottom view of the tumbler **60** shown in FIGS. **6**A-**6**E, indicating a cut-away elevation G-G along the axis of the mouth **62**. FIG. **6**G is a cut-away front view of the tumbler **60**, wherein the cut-away is at Section G-G so that the interior of the tumbler **60** is visible. The female zipper member **68** extends from one spout **63** to the other. The female zipper member **68** has two flanges **104**, which define a channel between for receiving the head **102** of the male zipper member **67** (not shown). The flanges **104** taper and become smaller as they extend toward the spouts **63** so that they terminate at the spouts **63**. Of course, the channel defined between the flanges **104** also terminates at the spouts **63**.

Referring again to FIGS. **6**A and **6**B, the male and female zipper members **67** and **68** do not interfere with the spout **63**. When the mouth **62** is open, the male and female zipper members **67** and **68** do not engage with each other at the spouts **63**. This allows a fluid contained within the tumbler **60** to be poured out of either spout **63** without flowing over either of the male and female zipper members **67** and **68**. Rather, the fluid may flow between the male and female zipper members **67** and **68** through either of the spouts **63**. Further, because the zipper members do not engage when the mouth **62** is open, there is less opportunity for debris and residue to become lodged in the channel defined between the flanges **104** of the female zipper member **68** or behind the head **102** of the male zipper member **67**.

FIGS. **7**A-**7**D show perspective cross-sectional end views of an alternative tumbler **70**. The tumbler **70** comprises a base **71** that is generally circular in shape. The tumbler **70** further comprises a mouth **72** at the top, wherein the mouth is generally circular when open and generally linear when closed. At each end of the interior of the mouth **72**, the tumbler **70** has a spout **73**. In this embodiment, the tips **79**, formed at each end of the mouth **72**, have wall thicknesses approximately the same as the side walls forming the mouth **72**. The male zipper member **77** is positioned just inside the mouth **72** and protrudes from one interior side of the tumbler **70** and extends from one spout **73** to the other spout **73**. The female zipper member **78** is positioned just inside the mouth **72** and protrudes from the other interior side of the tumbler **70** and extends from one spout **73** to the other spout **73**. In this embodiment, the male and female zipper members **77** and **78** have end sections near the spouts **73** that are much different than the middle sections.

FIG. **7**A is a perspective view of the tumbler **70**. FIG. **7**B is a top view of the tumbler **70** with indicated cross-sections, wherein sections C-C and D-D are shown in FIGS. **7**C and **7**D, respectively. FIG. **7**C shows the male zipper member **77** has a button or mushroom profile having a trunk **101** with a head **102** at the distal end of the trunk **101**. The head **102** is wider than the trunk **101** so that two shoulders **103** extend in opposite directions from the trunk **101**. In cross-section, the female zipper member **78** comprises two opposed flanges **104**, wherein each flange **104** has a shoulder **105** extending toward the opposite flange **104**. When the male and female members **77** and **78** are engaged to close and seal the mouth **72**, the head **102** is inserted between the flanges **104** until the shoulders **103** of the male zipper member **77** become locked behind shoulders **105** of the female zipper member **78**. Both the male zipper member **77** and female zipper member **78** maintain their cross-sectional profiles throughout the entire middle sections. The ends of the male and female zipper members **77** and **78** have a different profile compared to the middle sections. The ends of the male zipper members **77** have a cross-sectional profile in the shape of a headless trunk **107**. See FIG. **7**D. The ends of the female zipper members **78** have a cross-sectional profile in the shape of two shoulderless flanges **108**, which define a channel between the flanges. See FIG. **7**D. Thus, a difference between the embodiment of FIGS. **6**A-**6**F and the embodiment of FIGS. **7**A-**7**D is that the shoulders **103** and **105** terminate well before the male and female zipper members **77** and **78** terminate at the spouts **73**. However, a similar feature of the two embodiments is that the male and female zipper members **77** and **78** do not interfere with the spout **73**. When the mouth **72** is open, the male and female zipper members **77** and **78** do not engage with each other at the spouts **73**. This allows a fluid contained within the tumbler **70** to be poured out of either spout **73** without flowing over

either of the male and female zipper members **77** and **78**. Rather, the fluid may flow between the headless trunk **107** and the shoulderless flanges **108** through either of the spouts **73**. Further, because the zipper members do not engage when the mouth **72** is open, there is less opportunity for debris and residue to become lodged in the channel defined between the shoulderless flanges **108** of the female zipper member **78** or around the headless trunk **107** of the male zipper member **77**.

Although the disclosed embodiments are described in detail in the present disclosure, it should be understood that various changes, substitutions and alterations can be made to the embodiments without departing from their spirit and scope.

What is claimed is:

**1**. A silicone container making process, the process comprising:

placing a first mold in proximity with at least a second mold to define a mold cavity of sufficient size and shape to mold a unitary whole container;

mixing a base-forming material and a catalyst to make uncured silicone;

putting the uncured silicone into the mold cavity;

curing the uncured silicone by applying heat and pressure to the uncured silicone in the mold cavity until the silicone cures to form the unitary whole container comprising:

a container portion defining a mouth, wherein the mouth has at least one flexible spout and first and second interior sides opposite each other;

a zipper portion comprising:

a female zipper member extending from the first interior side of the mouth, the female zipper member comprising:

a female middle section comprising two middle flanges defining a middle channel between the two middle flanges, and

at least one female end section proximate the at least one flexible spout and comprising two end flanges extending from the first interior side of the mouth to define an end channel between the two end flanges,

wherein the two middle flanges extend farther from the first interior side of the mouth than the two end flanges;

a male zipper member extending from the second interior side of the mouth, wherein the female and male zipper members are positioned opposite each other so as to be engageable when closing the mouth, the male zipper member comprising:

a male middle section comprising a middle trunk; and

at least one male end section proximate the at least one flexible spout comprising an end trunk,

wherein the middle trunk extends farther from the second interior side of the mouth than the end trunk;

opening the first mold relative to the at least second mold; and

removing the container from the mold cavity.

**2**. A silicone container making process, as claimed in claim **1**, wherein said mixing a base-forming material and a catalyst to make uncured silicone comprises mixing in a mixing chamber and the uncured silicone comprises liquid silicone, wherein said putting the uncured silicone into the mold cavity comprises injecting liquid silicone.

**3**. A silicone container making process, as claimed in claim **1**, wherein said mixing a base-forming material and a catalyst to make uncured silicone comprises mixing a granular bulk material and a catalyzing powder, and the uncured silicone comprises a silicone dough, wherein said putting the uncured silicone into the mold cavity comprises placing the silicone dough into the mold cavity.

**4**. A silicone container making process, as claimed in claim **1**, wherein said curing the uncured silicone by applying heat and pressure to the uncured silicone in the mold cavity comprises curing the silicone to a durometer of between 30 and 80 shore A.

**5**. A silicone container making process, as claimed in claim **1**, wherein said curing the uncured silicone by applying heat and pressure to the uncured silicone in the mold cavity comprises curing the silicone to have an elongation break between 290% and 620%.

**6**. A silicone container making process, as claimed in claim **1**, wherein said curing the uncured silicone by applying heat and pressure to the uncured silicone in the mold cavity comprises curing the silicone to have a tear strength of between 21 N/mm and 33 N/mm.

**7**. A silicone container making process, as claimed in claim **1**, wherein said curing the uncured silicone by applying heat and pressure to the uncured silicone in the mold cavity comprises heating the uncured silicone to at least 300 degrees Celsius.

**8**. A silicone container making process, as claimed in claim **1**, wherein placing a first mold in proximity with at least a second mold to define a mold cavity of sufficient size and shape comprises defining the mold cavity to produce a wall thickness of the at least one flexible spout between 0.7 mm and 1.3 mm.

**9**. A silicone container making process, the process comprising:

placing a first mold in proximity with at least a second mold to define a mold cavity of sufficient size and shape to mold a unitary whole container;

mixing a base-forming material and a catalyst to make uncured silicone;

putting the uncured silicone into the mold cavity;

curing the uncured silicone, by applying heat and pressure to the uncured silicone in the mold cavity, to form the unitary whole container having a durometer of between 30 and 80 shore A and comprising:

a container portion defining a mouth, wherein the mouth has at least one flexible spout and first and second interior sides opposite each other, wherein the first and second interior sides have thicknesses greater than 0.5 mm;

a zipper portion comprising:

a female zipper member extending from the first interior side of the mouth and tapering until it terminates at the at least one flexible spout; and

a male zipper member extending from the second interior side of the mouth and tapering until it terminates at the at least one flexible spout;

opening the first mold relative to the at least second mold; and

removing the unitary whole container from the mold cavity.

**10**. A silicone container making process, as claimed in claim **9**, wherein said mixing a base-forming material and a catalyst to make uncured silicone comprises mixing in a mixing chamber and the uncured silicone comprises liquid silicone, wherein said putting the uncured silicone into the mold cavity comprises injecting liquid silicone.

**11**. A silicone container making process, as claimed in claim **9**, wherein said mixing a base-forming material and a catalyst to make uncured silicone comprises mixing a granular bulk material and a catalyzing powder, and the uncured silicone comprises a silicone dough, wherein said putting the uncured silicone into the mold cavity comprises placing the silicone dough into the mold cavity.

**12**. A silicone container making process, as claimed in claim **9**, wherein said curing the uncured silicone comprises curing the silicone to have an elongation break between 290% and 620%.

**13**. A silicone container making process, as claimed in claim **9**, wherein said curing the uncured silicone comprises curing the silicone to have a tear strength of between 21 N/mm and 33 N/mm.

**14**. A silicone container making process, as claimed in claim **9**, wherein said curing the uncured silicone comprises heating the uncured silicone to at least 300 degrees Celsius.

**15**. A silicone container making process, the process comprising:

placing a first mold in proximity with at least a second mold to define a mold cavity of sufficient size and shape to mold a unitary whole container;

mixing in a mixing chamber a base-forming material and a catalyst to make liquid uncured silicone;

injecting the liquid uncured silicone into the mold cavity;

curing the liquid uncured silicone, by applying heat and pressure to the liquid uncured silicone in the mold cavity, to form the unitary whole container comprising:

a container portion defining a mouth, wherein the mouth has at least one flexible spout and first and second interior sides opposite each other, wherein the first and second interior sides have thicknesses greater than 0.5 mm;

a zipper portion comprising:

a female zipper member extending from the first interior side of the mouth, the female zipper member comprising:

a female middle section less than 5.0 mm thick comprising two middle flanges defining a middle channel between the two middle flanges, and

at least one female end section proximate the at least one flexible spout and comprising two end flanges extending from the first interior side of the mouth to define an end channel between the two end flanges,

wherein the two middle flanges extend farther from the first interior side of the mouth than the two end flanges;

a male zipper member extending from the second interior side of the mouth, wherein the female and male zipper members are positioned opposite each other so as to be engageable when closing the mouth, the male zipper member comprising:

a male middle section less than 5.0 mm thick comprising a middle trunk; and

at least one male end section proximate the at least one flexible spout comprising an end trunk,

wherein the middle trunk extends farther from the second interior side of the mouth than the end trunk;

opening the first mold relative to the at least second mold; and

removing the unitary whole container from the mold cavity.

**16**. A silicone container making process, as claimed in claim **15**, wherein said curing the liquid uncured silicone comprises curing the silicone to a durometer of between 30 and 80 shore A.

**17**. A silicone container making process, as claimed in claim **15**, wherein said curing the liquid uncured silicone comprises curing the silicone to have an elongation break between 290% and 620%.

**18**. A silicone container making process, as claimed in claim **15**, wherein said curing the liquid uncured silicone comprises curing the silicone to have a tear strength of between 21 N/mm and 33 N/mm.

**19**. A silicone container making process, as claimed in claim **15**, wherein said curing the liquid uncured silicone comprises heating the silicone to at least 300 degrees Celsius.

**20**. A silicone container making process, as claimed in claim **15**, wherein placing a first mold in proximity with at least a second mold to define a mold cavity of sufficient size and shape comprises defining the mold cavity to produce a wall thickness of the at least one flexible spout between 0.5 mm and 1.3 mm.

* * * * *

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1161

**Short Case Caption:** Zip Top, Inc. v. SC Johnson & Son Incorporated

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 10,692 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 06/07/2024

Signature: /s/R. William Beard, Jr.

Name: R. William Beard, Jr.

Save for Filing

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2024-1161

**Short Case Caption:** Zip Top, Inc. v. SC Johnson & Son Incorporated

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 9 number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 06/07/2024

Signature: /s/R. William Beard, Jr.

Name: R. William Beard, Jr.